**David K. NELSON, JR.,
Plaintiff–Appellee,**

v.

**Allan STREETER, Dorothy Tillman, and Bobby L. Rush, Defendants–Appellants.**

**Nos. 92–2991, 92–3177.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1994.

Decided Feb. 1, 1994.

146

Marc Beem, Barry A. Miller, Diane F. Klotnia, Miller, Shakman, Hamilton, Kurtzon & Schlifke, Harvey M. Grossman (argued), Jane M. Whicher, Alan K. Chen, Roger Baldwin Foundation of ACLU, Inc., Diane C. Geraghty, Loyola University School of Law, Chicago, IL, for David K. Nelson.

James P. Chapman (argued), Chapman & Associates, Lewis Myers, Jr., Chicago, IL, for Allan Streeter and Dorothy Tillman.

Lawrence E. Rosenthal, Office of the Corp. Counsel, Mardell Nereim, Benna R. Solomon,

Susan S. Sher, Office of the Corp. Counsel, Appeals Div., Chicago, IL, for City of Chicago, amicus curiae.

Before POSNER, Chief Judge, and EASTERBROOK and KANNE, Circuit Judges.

POSNER, Chief Judge.

Harold Washington, Chicago's first black mayor, died suddenly of a heart attack in November 1987, shortly after being reelected. He had become a revered figure to the black community of Chicago—so much so that shortly after his death a poster went on sale in which a smiling Harold Washington is shown in the company of Jesus Christ floating above the Chicago skyline; the poster is captioned "Worry Ye Not." David Nelson, a student at the School of the Art Institute of Chicago, did not think Washington deserving of deification, and so for his entry in the school's annual fellowship competition Nelson submitted a painting intended (he claims) to portray Washington in a more human light. The painting, entitled "Mirth and Girth" and based on a rumor that doctors at the hospital to which Washington had been brought when he suffered his fatal heart attack had discovered that underneath his suit he was wearing female underwear, is a full-length frontal portrait of a portly grim-faced Harold Washington clad in a white bra and G-string, garter belt, and stockings.

Nelson's painting, together with the submissions of the other students, was placed on exhibition on May 11, 1988. The exhibition was open to students, faculty, and invited guests, but not to the public at large. The students' works were to be judged by four experts. The winners would receive cash prizes, and their winning works would be exhibited at a public exhibition. "Mirth and Girth," however, was destined not to be judged—not in the expected fashion, at any rate. As soon as the exhibition of student work opened and visitors saw Nelson's painting, it became the focus of outraged attention. A security guard was quickly posted in front of it to protect it from an angry crowd of students. The school began receiving enraged phone calls. School officials asked Nelson to remove the painting. He refused.

Word of the painting came to the Chicago City Council, which was in session. Alderman Bobby Rush prepared a resolution, which was signed by, among others, Aldermen Allan Streeter and Dorothy Tillman, threatening to cut off the City's contribution to the Art Institute unless the Institute apologized for displaying "Mirth and Girth." The resolution passed, together with another resolution, which requested the Art Institute to remove the painting immediately.

The aldermen (one of whom has since become a Congressman) whom we have named are three of the defendants in this suit, and are the appellants in this appeal. But they were not the first aldermen to arrive at the scene. Aldermen Henry and Jones arrived first. Henry brandished a gun, and Jones removed the painting from the wall and placed it on the floor, facing the wall. They left, and a student rehung the painting. Then the defendants arrived. They took the painting down and tried to carry it out of the school, but were stopped by a school official, then diverted (carrying the painting) to the office of the president of the School of the Art Institute, Anthony Jones. When the painting arrived in Jones's office, it had a one-foot gash, but it is not known precisely when, or by whom, the gash had been inflicted. The aldermen told Jones that they were there to carry out the City Council's resolution to remove the painting from the Art Institute. The aldermen wrapped the painting in brown paper to prevent anyone from seeing it. According to one witness, Alderman Tillman threatened to burn the painting right there in President Jones's office but was dissuaded by a police lieutenant who was present, Raymond Patterson. Another alderman (not one of the defendants) called Chicago Police Superintendent Leroy Martin, a defendant but not an appellant. Martin telephoned Patterson in President Jones's office and ordered him to take the painting into police custody. A police sergeant, accompanied by the three defendant aldermen, carried the wrapped painting to a police car. The scene was televised, and broadcast widely, confirming, if confirmation was needed, that Chicago had replaced Boston as the censorship capital of the United States. *Ter-*

*miniello v. City of Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *Gregory v. City of Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); *Police Dept. v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *Collin v. Smith*, 578 F.2d 1197 (7th Cir.1978); *Sefick v. City of Chicago*, 485 F.Supp. 644 (N.D.Ill.1979); *Friedrich v. City of Chicago*, 619 F.Supp. 1129 (N.D.Ill.1985); *American Civil Liberties Union v. City of Chicago*, 3 Ill.2d 334, 121 N.E.2d 585 (1954); Steven C. Dubin, *Arresting Images: Impolitic Art and Uncivil Actions* chs. 2, 5 and pp. 47, 50, 64, 90, 93, 127, 165–66, 192–93, 222–23 (1992).

"Mirth and Girth" was kept in custody until the evening of the following day, when it was released (we assume on its own recognizance) to David Nelson. The painting has not been repaired, exhibited, or sold. It is an exhibit in this suit, and Nelson's counsel has physical custody of it. During the set-to in the president's office Jones had signed a statement promising that if the painting was returned it would not be "displayed or shown in any way without a meeting and resolution of the Board of Trustees and members of the City Council." Later the president of the Art Institute's board, Marshall Field, issued a public apology in which he promised that the painting would not be returned to public display.

Nelson filed this civil rights damages suit in 1988, shortly after the incident. The suit, based on 42 U.S.C. § 1983, charges that the defendants, acting under color of state law, deprived Nelson of rights secured to him by the First and Fourth Amendments, made applicable to state and local government by interpretation of the Fourteenth Amendment. Although the bizarre facts and the prominence of the defendants have attracted public attention to the case, it is straightforward from a legal standpoint and we are distressed by its protraction. We are being asked to resolve the threshold issue of immunity in a case that is five years old.

The appeals are from the district judge's rejection of the defense of official immunity. A public official is not answerable in damages for a violation of the Constitution unless, at the time he acted, the law was clear that what he was doing really *did* violate the Constitution. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In other words, he is not chargeable with predicting expansions in constitutional liability. So we must ask whether in 1988 the law was clear that local government officials may not go onto private property without invitation (the aldermen had not been invited to the exhibition of student work), seize a painting that they do not like because it vilifies a public official with whom they had been associated, and wrap it in brown paper and remove it so that no one can see it. To ask the question is pretty much to answer it. As Chief Justice Warren said in another case involving an effort to suppress public criticism of a mayor of Chicago, "This is a simple case." *Gregory v. City of Chicago, supra*, 394 U.S. at 111, 89 S.Ct. at 946.

If the City owned the Art Institute, it would have some power—how much we need not decide—to regulate offensive displays. *Piarowski v. Illinois Community College Dist. 515*, 759 F.2d 625 (7th Cir.1985); *Close v. Lederle*, 424 F.2d 988 (1st Cir.1970). The City does not own the Art Institute, and its officials have no more right to enter it uninvited and take the art off its walls than they would have to enter a private home and take "offensive" art off its walls. Cf. *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam). It has been clear since long before 1988 that government officials are not permitted to burn books that offend them, and we do not see any difference between burning an offensive book and burning an offensive painting. Since Hogarth, and indeed since long before, the visual arts have been a medium of political and social commentary. David Nelson had as much right to paint Mayor Washington in women's underwear as Thomas Nast had to caricature Boss Tweed. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), eliminates any possible doubt on that score, and it was decided two and a half months before the seizure of Nelson's painting.

We do not understand the aldermen's counsel to disagree. They do not argue that a city with a black mayor and a large black population is entitled to a dispensation from the restraints that constitutional and civil rights law places on public officials, merely because blacks are a minority of the national population and have long been victims of racial discrimination. Even the most extreme advocates of "hate speech" codes, designed to shield groups perceived as vulnerable from offensive, hurtful, and wounding speech, do not argue that a public official should be immune from offensive, hurtful, and wounding criticism merely because he is a member of a minority group. "Transvestite" is not a racial epithet. While Alderman Rush testified that Nelson's painting was one more effort to depict the black male as "impotent," many is the white official who has been vilified for his sexual activities or preferences, real or conjectured. The appellants' counsel make two different points. The first is that when they took down the painting the aldermen were acting as private citizens—as personal friends and admirers of the late Mayor Washington—rather than as government officials, much as President Truman was acting as a private citizen rather than as President of the United States when he lashed out at critics of his daughter Margaret's singing. Whatever the merit of this argument (the aldermen were permitted to remove a work of art from its place of exhibition in the Art Institute—would a private person have been permitted to do so, or would he have been arrested on the spot?), it is not properly before us. It does not bear on the defense of immunity. In fact it contradicts it. If the defendants were not acting under color of state law, that is, as officials, they are not entitled to official immunity. Official immunity is for officials. President Truman could not have pleaded official immunity if a music critic had sued him for intentional infliction of emotional distress.

 The aldermen's second argument is that they took down the painting in order to save it from destruction at the hands of a mob, or alternatively to spare Chicago the devastating riots that the continued exhibition of the painting might have sparked, and that it was unclear in 1988 and it is unclear today that the temporary removal of a painting, so motivated, deprives the artist of his constitutional rights. This argument is germane to the aldermen's defense of immunity, but it is based on an interpretation of the facts that we are not authorized to accept at this stage in the litigation. An official is entitled to immunity only if the uncontested or uncontestable facts reveal that his acts did not invade the plaintiff's clearly established constitutional rights. At least this is so where, as in this case, the defense is raised by motion for summary judgment. The motion can be granted only if there is no genuine issue of material fact bearing on the entitlement to immunity. *Marshall v. Allen,* 984 F.2d 787, 793 (7th Cir.1993); *Apostol v. Landau,* 957 F.2d 339, 342 (7th Cir.1992); *Elliott v. Thomas,* 937 F.2d 338, 342 (7th Cir.1991). It is unresolved whether the official can ask the district judge to find the facts, if they are contested, rather than letting the factual issues that bear on immunity be resolved by the jury (if there is a jury) along with the merits. *Jones v. City of Chicago,* 856 F.2d 985, 994–95 (7th Cir.1988); *Mahoney v. Kesery,* 976 F.2d 1054, 1058 (7th Cir.1992). The question has not been raised in this case, so we leave it for another day.

The aldermen's version of the facts is not only contestable and contested, but unsupported. This is clearest with respect to the first branch of the "angry mob" defense, the branch in which the aldermen cast themselves as First Amendment Good Samaritans. Alderman Tillman testified at her deposition that she did not want the painting hung in *any* public place and that if it were rehung she would attempt once again to remove it. She wanted to burn the painting, not to protect it from an angry mob. And there was no mob. There were angry people at the Art Institute—not least the aldermen, who should have been setting an example of cool self-restraint rather than threatening to seize and destroy private property. But the police, though there were only a handful of them, had the situation well in hand. *Cox v. Louisiana,* 379 U.S. 536, 550, 85 S.Ct. 453, 462, 13 L.Ed.2d 471 (1965); *Edwards v. South Carolina,* 372 U.S. 229, 232–33, 236, 83 S.Ct. 680, 682, 683–84, 9 L.Ed.2d 697 (1963).

The second branch of the argument—that but for the aldermen's timely intervention, "Mirth and Girth" might have sparked a riot to match that touched off by the assassination of Dr. Martin Luther King, Jr. in 1968—also depends on contested facts. The suggestion that Chicago's black community was tinder in May 1988 because Mayor Sawyer (Washington's successor, also black) had just fired Steve Cokeley, who, we are told in the aldermen's opening brief, "was perceived by many to have been fired ... because he chose to speak out (exercising his First Amendment rights) against what he alleged was a Jewish conspiracy among doctors at Cook County," is a conjecture far too weakly anchored in the record to have the status of uncontestable fact. And the aldermen cannot be permitted to defend their actions by reference to such unrest within the black community as their own lawless, provocative, and publicity-mongering actions may have stirred up.

Yet Chicago is no stranger to urban riots, and the possibility that the aldermen's intervention averted a riot, although remote, cannot be discounted entirely, at least on the basis of the record compiled in the summary judgment proceedings. In appraising the legal significance in 1988 of this possibility—a slight possibility that a public exhibition of a work of art might cause a riot—we ought first to distinguish between a situation in which a speaker, writer, or artist intends to incite a riot and a situation in which a riot erupts because his message is offensive or unpopular. The First Amendment does not protect a speaker who eggs his audience on to commit a violent act, whether against himself or against others, *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam); *Feiner v. New York*, 340 U.S. 315, 320–21, 71 S.Ct. 303, 306–07, 95 L.Ed. 295 (1951); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942), though even in that case, provided the speech or other work has some expressive content, proof may be required that the danger of violence was more than theoretical, was, in Holmes's famous formula, "clear and present." *Brandenburg v. Ohio, supra*, 395 U.S. at 447, 89 S.Ct. at 1829 (1969); *Feiner v. New York,*

*supra,* 340 U.S. at 320, 71 S.Ct. at 306. There is no evidence that in creating and exhibiting "Mirth and Girth" as his entry in an art students' competition Nelson intended to provoke a riot or that the danger of a riot was great.

In the second situation, the artist's intentions are innocent, at least innocent of any desire to cause a riot, but his work so inflames the community as to cause a riot in which people are killed and injured. First Amendment rights are not subject to the heckler's veto. *Cox v. Louisiana, supra,* 379 U.S. at 551, 85 S.Ct. at 462–63. The rioters are the culpable parties, not the artist whose work unintentionally provoked them to violence. Even if *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), which holds that the Constitution does not create a right to be protected against private violence, might be thought to imply that the police do not have a constitutionally enforceable duty to protect an artist and the populace from a mob, there is nothing in that decision to suggest that police and other public officials can seek to protect the populace at the expense of the artist, by "arresting" the offensive painting rather than the violent rioters.

The appellants argue that the "heckler's veto" cases involve situations in which the threat of mob violence was latent, and here, they say, the mob was already forming, milling about inside and outside the Art Institute. That is not a correct description either of the previous cases or of this case. *Terminiello* was a case of actual violence, 337 U.S. at 14–16, 69 S.Ct. at 900–02 (Jackson, J., dissenting), while this is a case—construing the facts, as we must, as far against the appellants as the record will permit—in which the prospect of mob violence was not only a future prospect rather than a present reality, but a very faint future prospect. Burn down Chicago over a painting? Paris maybe, but Americans have never taken culture *that* seriously.

There is a second issue of immunity. The complaint charges that the aldermen by seizing the painting also violated Nelson's rights under the Fourth Amendment, which forbids unreasonable searches

and seizures, including seizures of personal property. The appellants argue that no clearly established Fourth Amendment right of his was violated, because the seizure was temporary and anyway the painting was not in his custody when it was seized. It was well settled, however, in 1988 that temporary seizures are within the scope of the Fourth Amendment, *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); most police seizures of evidence, as distinct from contraband, *are* temporary. For a seizure to be actionable all that is required is "some meaningful interference with an individual's possessory interest," *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984), "however brief," *id.* at 113 n. 5, 104 S.Ct. at 1656 n. 5, and there was that here. And although the painting was not in Nelson's custody, the theft of a person's property is no less a theft of his property if the property is taken from a warehouse where it is being stored than if it is taken out of his home. The painting was Nelson's personal property. The Art Institute was merely a bailee. Of course by a contract of bailment a bailor may temporarily surrender some of his rights over the bailed good. By agreeing to exhibit his painting Nelson parted temporarily with the right to decide who could look at it. He did not part with the right to withhold it from vandals. So obvious is this that we do not think the absence of case law can establish a defense of immunity. Anyway it is enough to defeat the defense that the aldermen knew that Nelson's painting belonged to *somebody* and that they were not authorized to remove it. If police steal private property it is no defense to a suit by the owner that they did not know who owned it though they knew that somebody did—that it had not been abandoned. It would be a harder case if the aldermen had removed the painting with the consent of the Art Institute.

The purpose of the doctrine of official immunity is to protect officials from legal surprises. The defendants could not have been surprised to learn that they were not free to take down paintings from the walls of the Art Institute.

We said that the case has been distressingly protracted. It is not a complicated case, although it raises interesting questions concerning compensatory damages, on which see generally *Memphis Community School District v. Stachura*, 477 U.S. 299, 306–10, 106 S.Ct. 2537, 2542–45, 91 L.Ed.2d 249 (1986); *Hessel v. O'Hearn*, 977 F.2d 299, 301–02 (7th Cir.1992). *Taliferro v. Augle*, 757 F.2d 157, 161–62 (7th Cir.1985), upheld an award of damages for the destruction of expressive work that had no market value, but here the work was damaged, detained, and removed from a student competition, rather than destroyed—and we do not know whether the defendants were responsible for the damage. They make the interesting argument that by their highly publicized seizure of a painting by an obscure art student they increased its market value—an argument that if accepted would allow censors to seek restitution from their victims. Issues of damages (punitive as well as compensatory, see *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Soderbeck v. Burnett County*, 752 F.2d 285, 289–92 (7th Cir.1985)) aside, most of the relevant facts were captured on videotape on May 11, 1988. If we may judge from the arguments on appeal, the defendants' defenses to liability are threadbare, whatever may be the precise measure of damages.

Nevertheless, the district judge, after holding the motions for summary judgment under advisement for eight months, referred them to a magistrate judge, where they remained for seven months, after which the district judge took another four and a half months to rule on the magistrate judge's recommended disposition. As a result, more than a year and a half elapsed before the filing and disposition of the motions for summary judgment. There is no justification for such delay. It is time that the district judge took firm control of this case and guided it to a swift conclusion. The governing principles are clear, the facts have been explored exhaustively, and the defendants should be aware that efforts to mount a last-ditch, no-holds-barred defense may simply increase their liability for the plaintiff's attorney's fees under 42 U.S.C. § 1988.

AFFIRMED.