**BBI ENTERPRISES, INC., Plaintiff,**

v.

**CITY OF CHICAGO, Defendant.**

No. 94 C 5512.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 1, 1995.

Reed Lee, Michael Hull, Chicago, IL, for plaintiff.

Frank Berry, Corporation Counsel, City of Chicago, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER[1]

SHADUR, Senior District Judge.

After a long and tortuous journey, this litigation—on which the parties first crossed swords, despite the fall 1994 case number of the current action, in mid–1993—has nearly reached the point of a partial consideration on the merits. "Nearly" and "partial" are the right words, because even now the question for decision is only whether plaintiff BBI Enterprises, Inc. ("BBI," the owner and operator of its "Top Shelf" establishment) is entitled to a preliminary injunction against enforcement by the City of Chicago ("City") of its adult use ordinance (the "Ordinance"[2]).

---

1. See Appendix 1.

2. Although this opinion refers to the Ordinance in singular terms, the provisions targeted by BBI cut across a number of areas of the Municipal Code—the definition of "adult uses," the definition of "adult entertainment cabaret" and various provisions of the Chicago Zoning Ordinance,

including one requiring Chicago Zoning Board of Appeals ("ZBA") approval of a special use variation before any property can be utilized for an adult use. And as explained in Appendix 2, BBI properly focuses on the claimed unconstitutionality of the 1993 version of the Ordinance (when BBI made its financial commitments and commenced its operations), for if that version were

And of course preliminary injunctive relief for a plaintiff depends not on its making a showing that it will actually prevail, but rather on the lesser showing of "some likelihood of succeeding on the merits" (*Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir.1984)).

Two major ironies have marked this dispute from the very outset:

1. Despite the United States Supreme Court's reconfirmation that nude performance dancing such as that offered at the Top Shelf is entitled to First Amendment protection because it qualifies as "expressive conduct" (*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66, 581, 587, 111 S.Ct. 2456, 2459–60, 2468, 2471, 115 L.Ed.2d 504 (1991)), Chicago's City Council has done its best to stifle or extinguish that activity by setting up extraordinary hurdles in the form of the Ordinance.[3] That of course is not surprising—Chicago's legislators have long exhibited crabbed views of First Amendment rights, both in sex-related Comstockian ways (such as the City's motion picture censorship ordinance of earlier days) and otherwise (see, e.g., *Nelson v. Streeter*, 16 F.3d 145 (7th Cir. 1994)). Instead the irony is that at the same time so many of the City Council's purported guardians of public morality have become substantial contributors to the population of the United States Bureau of Prisons and have otherwise distinguished themselves by exhibiting other conduct of their own that most people would label as immoral.

2. To support its enactment of the Ordinance, the City Council included a number of deleterious consequences said to be attributable to adult uses, for the obvious purpose of exhibiting the moral threat thought to be posed by establishments such as Top Shelf. Yet when BBI went before the ZBA seeking to obtain a variation as an authorized adult use, that body found that *not one* of those consequences applied to Top Shelf to a degree sufficient to require BBI to offer any proof at all on those subjects: neither any increase in crime in the neighborhood, nor any adverse effect on other commercial or industrial enterprises in the surrounding area, nor any substantial injury to the value of other property in the neighborhood, nor any adverse effect on traffic flow, nor any generation of noise in excess of permitted levels, nor any adverse effect on the character of the surrounding neighborhood because of Top Shelf's hours of operation, nor any inconsistency with the exterior appearance of other commercial establishments.[4]

indeed unconstitutional Top Shelf would have been a prior valid nonconforming use when the 1994 amendment to the Ordinance was adopted.

3. To be sure, this Court personally holds no brief for the type of entertainment offered by Top Shelf. But unlike City and (regrettably) its counsel, this Court recognizes the right of others to hold and to practice different views. Now–Chief-Judge Richard Posner of our Court of Appeals put the matter well in the course of a long and thoughtful concurrence to that court's en banc opinion that was later reversed in *Barnes* on grounds other than the general existence of First Amendment protection for such activity (*Miller v. City of South Bend*, 904 F.2d 1081, 1100 (7th Cir.1990)):

> Censorship of erotica is pretty ridiculous too. What kind of people make a career of checking to see whether the covering of a woman's nipples is fully opaque, as the statute requires? (These statutes are full of absurd locutions, such as: " 'Wholly or substantially exposed to public view,' as it pertains to breasts, shall mean...." Chattanooga Ord. No. 7420, § 25–28.2(b), quoted in *City of Chattanooga v.

*McCoy, supra*, 645 S.W.2d [400] at 401 [Tenn. 1983].) Most of us do not admire the Islamic clergy for their meticulous insistency on modesty in female dress. Many of us do not admire busybodies who want to bring the force of law down on the heads of adults whose harmless private pleasures the busybodies find revolting. The history of censorship is a history of folly and cruelty.

4. BBI's final Mem. 2–7 urges that the ZBA's findings to that effect render the Ordinance unconstitutional as applied to BBI, and its Mem. 7–14 attacks the Ordinance on its face in the same terms. Those arguments cannot prevail, however, because of BBI's violation (referred to later) of an unquestionably valid locational requirement under which Top Shelf is too close to a residentially-zoned portion of the City. It is also worth observing (1) that ZBA did not actually find by a preponderance of the evidence that Top Shelf did *not* cause any deleterious effects, but it rather held that the objectors to BBI's application had not proved by clear and convincing evidence (or at least by something more demanding than a preponderance) that BBI *did* do so,

Now perhaps the ultimate irony has emerged: Even though what seems to have been the deepest fear of City and its lawyers—the examination of the Ordinance by an impartial federal court—has finally been realized, this Court holds that City and not BBI prevails at this stage of the proceedings.

One other preliminary word in that respect is in order before this opinion turns to the issue at hand. What has made the course of this litigation most distressing has been the level of obstructionism offered up by City and its lawyers. They have exercised every imaginable tactic to avoid having the parties' dispute resolved on the constitutional merits—for example, just during these past few weeks they launched an unsuccessful attempt to take an end run around the nonappealability of the December 23, 1994 temporary restraining order ("TRO") issued by this Court, by seeking an ill-considered writ of mandamus from our Court of Appeals to block this Court's merits-related consideration of the Ordinance.[5] And the City Corporation Counsel's most recent filing last week—following the preliminary injunction hearing ("Hearing") that has been conducted by this

Court—has continued that pattern, again advancing counsel's several-times-rejected argument of mootness.[6] If this Court were more cynical, it might even suspect that such frantic efforts to avoid adjudication have reflected City's attorneys' deep lack of confidence in what the City Council hath wrought.

But this opinion at last turns to BBI's entitlement or lack of entitlement to preliminary injunctive relief. During the pendency of the TRO issued on December 23, 1994 and then extended on January 10, 1995, this Court conducted a three-day evidentiary Hearing on the preliminary injunction issues. Because the parties had understandably required some added time to prepare for the Hearing (including each side's having to depose the other's witnesses), the TRO period was then supplemented by City's reluctant agreement not to enforce the ordinance against BBI for another nine days, to allow this Court enough time to reach its decision and issue this opinion. That extension period runs out February 3, and the time has therefore proved sufficient to the purpose.

It is scarcely necessary to repeat the five requirements that the case law imposes on a

---

and (2) that once an ordinance is rendered facially valid by legitimate legislative findings as to the general problem to be dealt with, a specific operation does not necessarily escape the Ordinance's provisions by showing that those generically-validating characteristics do not in fact apply to that operation (a question not wholly settled by *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) and *id.* at 82, 96 S.Ct. at 2458 (Powell, J., concurring)). But again BBI's problem in attempting an as-applied challenge to the Ordinance will be shown in this opinion to be its noncompliance with a severable and valid requirement that is imposed on all adult uses by the Ordinance—remember that BBI does fit the Ordinance definition of an "adult use."

5. Another illustration of the shabby anything-to-win tactics employed by the Assistant Corporation Counsel assigned to this case is their argument at pages 11–12 of their final Supplemental Memorandum (filed January 25, one day *after* the final day of the Hearing, but of course in preparation well ahead of that date), captioned "BBI Was Dissolved as a Corporation as of July 1, 1994 and Therefore Has No Capacity To Sue Under Fed.R.Civ.P. 17(b)." That argument is supported by a certificate from the Illinois Secretary of State dated January *12*, 1995—so that City's lawyers obviously knew about BBI's disso-

lution for nonpayment of franchise taxes or its failure to file an annual report (whichever triggered the involuntary dissolution) *before* the Hearing began on January 19, yet never said a word on the subject until after the Hearing was concluded. Illinois law has indeed always provided that such a dissolution precludes a corporation from bringing suit (see currently 805 ILCS 5/15.85), but it has also long been established that such disability is cured retroactively when the deficiency is eliminated by payment or filing (even if the statute of limitations may have run in the interim, *Amman Food & Liquor, Inc. v. Heritage Ins. Co.*, 65 Ill.App.3d 140, 22 Ill.Dec. 242, 382 N.E.2d 562 (1st Dist.1978)). Where as here the sands of time have been running out on BBI while this Court's ruling has been in the works, such nondisclosure amounts to nothing more nor less than sandbagging. Such conduct would be reprehensible if encountered from any lawyer representing a private client, and if anything it is even worse when encountered from lawyers for a public body. If BBI had shown itself otherwise to be entitled to a preliminary injunction, this Court would not have hesitated to grant one for a short period to enable BBI to cure the technical flaw that was held back and then belatedly identified by City (thus restoring BBI to good standing).

6. See Appendix 2.

plaintiff who wishes to obtain a preliminary injunction. After a decade *Roland Machinery* remains the most lucid exposition of those conditions, and this opinion will assume familiarity with them. It is also unnecessary to spend more than a moment or two on most of them:

1. As to the inadequacy of any remedy at law and the irreparability of harm to BBI, what this Court has said in the course of its oral ruling granting the TRO has been reinforced and even strengthened by the evidence adduced at the Hearing.

2. It also remains true that City has shown no demonstrable harm flowing from the continued operation of the Top Shelf (other than the intangible harm of City's desire to enforce its Ordinance, which is really a bootstrap argument that depends on the validity of that Ordinance). And that same thing holds true for *Roland Machinery*'s final factor: whether the granting of a preliminary injunction would disserve the public interest—that is, whether inordinate harm would be visited on persons not represented before the court.

3. In light of what has just been said in the preceding two paragraphs, the balancing of harms (both absolutely and in terms of *Roland Machinery*'s "sliding scale" approach) comes down heavily in favor of BBI.

This opinion turns then to the substantive issue: BBI's likelihood of success on the merits. In that respect BBI has brought a two-level attack on the Ordinance, one on its constitutionality as applied to Top Shelf itself and the other asserting the unconstitutionality of the Ordinance in facial terms.

As for Top Shelf itself, its first attempt to challenge the Ordinance in Case No. 93 C 4274—one that this Court long deferred on *Pullman* abstention grounds (*Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941))—foundered because it then developed that there was an independent and adequate state law ground for denying permission for Top Shelf to operate as an adult use: BBI's then

noncompliance with the admittedly valid off-street parking requirements of City's Municipal Code. BBI claims that it has now cured that defect, but the Hearing disclosed that the waters were hopelessly muddied on that score: Despite the agreement that this Court had extracted from the ZBA's counsel to attempt to get a ruling from that body on the offstreet parking question, separate and apart from considerations of Top Shelf's compliance with the entire Ordinance as such, at its subsequent hearing the ZBA apparently refused to allow BBI to put in all of the proofs necessary to arrive at such a ruling.[7]

That however turns out to make no difference, for the Hearing before this Court has demonstrated that another independent and adequate ground contained within the Ordinance defeats BBI's unconstitutional-as-applied argument. One of the restrictions contained in the Ordinance—a constraint that has been upheld as valid in the seminal *City of Renton* decision (referred to later in this opinion) and in a number of subsequent decisions from Courts of Appeals for other Circuits—prohibits the establishment of any adult use within 1,000 feet of any area zoned for residential purposes. And it is undisputed that a portion of the Top Shelf premises is some 969 feet from the northwest corner of Sedgwick Street and Chicago Avenue, a residentially-zoned parcel.

Unlike the restrictions that are dealt with next in this opinion, compliance with that 1,000–foot restriction is readily verifiable from City's zoning maps alone. Anyone who is looking for a location for a proposed adult use establishment can determine whether a prospective site does or does not comply in that respect. It is true that (like all bright-line criteria) this one may appear arbitrary at the margins, but that does not render it constitutionally infirm (this is the constitutional counterpart of "a miss is as good as a mile"). In sum, BBI's voluntary selection of its present location, which it could have known was too close to a residential area had it conducted a wholly feasible investigation of the zoning maps, precludes it from mounting

---

7. After this opinion was written and was ready for issuance, City's counsel notified this Court of the ZBA's January 27 issuance of its decision. In that respect, see Appendix 1.

an attack on the Ordinance as applied to it alone.[8]

Three other 1,000–foot locational restrictions in the Ordinance must be considered: No adult use may be established within that 1,000–foot distance from (1) a school (undefined in the Ordinance), (2) a place of worship (also undefined) or (3) another adult use. That set of restrictions occupied the bulk of the parties' evidentiary presentations during the Hearing—a task rendered extraordinarily difficult by the amorphous nature of the inquiry. As applied by the ZBA (whose reading, though pending on administrative review in the state courts, is binding on this Court at this point as the administrative construction of the Ordinance), the "school" restriction included an establishment (Marwen Foundation) that could not conceivably have been ascertained by any reasonable means available to a party such as BBI that was seeking to identify a desirable location for its operation that would *conform* to the Ordinance's limitations.[9]

As to the effect of the several locational restrictions imposed by the Ordinance, both BBI and City offered opinion evidence at the Hearing. BBI called both an expert in the field of geography with particular emphasis on statistical research (Professor Edwin Thomas) and an expert in real estate research and market analysis (Cheryl Baxter of Economics Research Associates), while City called one of its own people, acknowledged to be an expert in land use planning (City's Director of Development Policy Thomas Smith). Unfortunately both Professor Thomas and Smith provided this Court with products that evoke the deprecatory term traditionally associated with faulty computer output, GIGO ("garbage in, garbage out"):

1. In Professor Thomas' case, the methodology that he employed was impeccable—but the problem was that the source material that was given to him to work with (a list of supposed schools and places of worship) was patently flawed by the inclusion of an unknown but substantial number of names and addresses that were nothing of the sort. Thus Professor Thomas' ultimate conclusion, including his entire proper use of "packing theory" to determine the maximum number of adult uses that could be introduced into areas eligible under the Ordinance, reflected an apparently material undercount (though the exact number cannot be specified at this point).

2. In Smith's case he used hopelessly outdated information: schools and places of worship as shown on zoning maps that were three or four decades old. In addition he included certain large tracts that could not realistically be treated as available for adult uses such as BBI's (such as the federal post office and customs house, railroad rights of way and a large tract of about 200 acres adjacent to O'Hare Airport).[10] Smith also testified to what he

---

8. What is implicit in the just-stated conclusion is the notion of severability—that is, the familiar principle that legislation such as the Ordinance will most often be construed in a way that will preserve its constitutionally sound provisions even if other provisions may prove constitutionally infirm. That approach is not applicable if a piece of legislation must be considered as a seamless all-or-nothing web, but that would not seem to be true of the Ordinance. And to confirm that, even though such statements of severability are not always taken at face value, Section 13 of the Ordinance sets out an express severability provision.

9. Marwen Foundation is not accredited as a school, does not require teacher training of any of its staff and is not listed as a school on any lists or publications that are reasonably available to the public (including the absence of any such listing in the Yellow Pages). Indeed, it is not even listed as a "school" on the building directo-

ry in the multi-use building partially occupied by Marwen. To the extent that the Ordinance is read to embrace such unaccredited, ill-defined and unlisted operations as so-called "schools" that disqualify nearby locations as permissible sites for adult use establishments, the Ordinance is more than problematic in constitutional terms. But once again a limitation of the "school" concept to the commonly-understood and readily ascertainable type of educational institution normally connoted by that word would appear to salvage the Ordinance by operation of its severability section.

10. See the perceptive discussion in *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1529–33 (9th Cir.1993) of the difference between the purely nominal "availability" of prospective sites and the real-world availability of such sites. Unfortunately for BBI (and again ironically), this case differs from the preliminary injunction situation described in *Topanga Press, id.* at 1533 in

thought were the conclusions to be derived from a random eyeballing in the course of his driving around in some areas—testimony that added little (if anything) to the reliability of his calculations. Finally, Smith admitted that he was simply not qualified to opine on the fundamental concept exemplified by Professor Thomas' use of packing theory.

There is no need to elaborate further on the deficiencies in either party's proof, for where as here neither side has supplied entirely reliable information, the party having the burden of persuasion—here BBI—must suffer the consequences of such uncertainty. When all is said and done, however, what is plain is that the total number of potential sites available for adult uses is substantially greater than the 64 that were calculated by Professor Thomas but is *far* fewer than the hundreds or even thousands absurdly suggested by Smith.

That last point illustrates another basic fallacy in City's contentions, a fallacy that has been carried into Smith's report. It may well be true that a large number of potential locations are available to BBI, which it should be remembered was the *first* applicant for a special use variation under the newly-adopted adult use ordinance and which is still one of only a tiny total number of applicants—but that early-applicant status is really irrelevant where the question at hand is the *facial* validity or invalidity of the Ordinance. Where Smith's (and hence City's) argument breaks down is in the failure to take into account the Ordinance's highly restrictive provision that prohibits any adult use from being located within 1,000 feet of any other adult use. It takes only a moment's thought to see that even one such use—the first one—immediately eliminates a very large number of other potential locations (every parcel that is even partially contained within a circle having a 1,000 foot radius, which amounts to fully 72 acres!), and that each additional established use substantially impacts the remaining available area

(though the adverse effect of each added use is less than that of the first). That is precisely the phenomenon that Professor Thomas' proper use of packing theory deals with, and the fact that City's expert does not understand it and that City's lawyers are unwilling to recognize it again confirms the unsoundness of City's entire approach to the issues.

Both sides do recognize, and this Court holds, that the seminal source of the operative principle that controls this litigation is *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). That case, which dealt with an ordinance banning adult theaters within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park or school (*id.* at 46, 106 S.Ct. at 928), summarized the principle in these terms (*id.* at 54, 106 S.Ct. at 932):

> In our view, the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city, and the ordinance before us easily meets this requirement.

In terms of BBI's current attack on the Ordinance's facial validity, that language and the analysis that has been employed in *Renton* and later opinions plainly cannot mean that the necessary "reasonable opportunity" can be satisfied by looking at the situation confronted by first-applicant BBI alone—or else a large city such as Chicago could mark out a minuscule token area for the location of adult uses and claim to pass constitutional muster. Instead the more sensible approach to the resolution of the issue is that the concept of "reasonable opportunity" must relate to the prospective producers of adult use goods and services *as a group.* And that approach is of course also directly responsive to the emphasis in the cases on the fact that the First Amendment serves not only the speaker but his or her audience—the members of the public who are interested in

that BBI has done a *better* job of preparation in one respect, by quantifying the effect of the packing-theory analysis. As explained later, it is the numbers that have been generated through that analysis that call for the denial of a preliminary

injunction here, while the element of uncertainty in that respect served to support the reasonableness of issuing a preliminary injunction in *Topanga Press.*

receiving communications that are First–Amendment protected (the demand side of the supply-and-demand dichotomy).

That approach also informs the proper answer to the question of what kinds of comparative statistics will provide useful assistance in the analysis of "reasonable opportunity." In that respect City's counsel have attempted to emphasize what percentage of the total area that is zoned for all commercial uses is available for adult use locations, attempting in that regard to compare Chicago with other cities referred to in reported cases (see particularly *Alexander v. City of Minneapolis,* 928 F.2d 278 (8th Cir.1991) and *Ambassador Books & Video, Inc. v. City of Little Rock,* 20 F.3d 858 (8th Cir.1994)). But even leaving aside the question whether that type of statistic may generally be an adequate surrogate for the more meaningful inquiry discussed later, that argument (like so many that are advanced by City) does not withstand scrutiny. City's lawyers are really comparing apples with oranges, for no permitted commercial uses in Chicago's zoning ordinances—that is, none except for adult uses—have any comparable restrictions that prevent any of them from being located near any other commercial use. Thus in terms of the possible utilization of sites as measured by the actual *numbers* of potential users, the relevant percentage shrinks dramatically below the 6.17% figure proffered by Smith (a figure that, as already indicated, is substantially too high to begin with).[11]

What is a clearly much more relevant basis for comparison is the relationship between (1) the number of a city's sites that are really available for adult uses and (2) that city's population—a relationship that speaks more directly in supply-and-demand terms. On

that score BBI's market analyst Baxter provided useful input (while City offered nothing). But BBI's basic problem—and what drives the decision on the current motion—is that when those figures are examined in light of this Court's knowledge that the underlying information provided to Professor Thomas was erroneous, so that he unquestionably understated the number of sites available under the Ordinance, it is clear that the potential adult-use locations provided by the Ordinance (viewed in facial terms) are very much of the same order, when calculated on a per-capita basis, as the numbers of such establishments in the two highly comparable urban communities of New York and Los Angeles.

To amplify on that conclusion: Baxter's method, which this Court finds sound, was to divide the respective populations of those two cities by their respective numbers of adult entertainment businesses, then to convert those ratios in terms of Chicago's population. That procedure demonstrated that the number of New York's adult businesses equated to 67 such businesses in Chicago, while Los Angeles' figures equated to 81 such businesses in this city. And Professor Thomas' figures for Chicago under the Ordinance, when necessarily moved upward somewhat from the 64 adult uses to which he testified, are unquestionably of the same general magnitude.

It thus cannot arguably be said that such essential equivalence in the range of sites available to serve Chicago's population provides any real basis for challenging the constitutionality of the Ordinance on its face (given the acknowledged and not-terribly-demanding constitutional standard of "reasonable opportunity").[12] And that then requires

---

**11.** No restrictive provision as to the proximity of adult uses comparable to the Ordinance's 1,000–foot limitation was involved in *Alexander,* where the ordinance permitted one adult use business "per block face" (928 F.2d at 280)—a much lesser constraint than Chicago's. As for *Ambassador Books* (which involved an ordinance that had *rejected* a 1,000–foot limitation from the various categories of protected use "as overly restrictive," instead employing a 750–foot measure, 20 F.3d at 860), it is not entirely clear that the 6.75% figure referred to in the opinion (see *id.* at 864) was making the same comparison that Smith made here. But even if the percentages

were in fact measuring comparable factors, it is bizarre for City's counsel to suggest that the upheld constitutionality of an ordinance that produced fully 97 available sites in the far smaller city of Little Rock somehow supports the constitutionality of an ordinance that provides *less* than that number of potential sites in the City of Chicago, with its nearly 3 million people.

**12.** Baxter also made a comparison with the city of Houston, which is well known (some would say notorious) for its total absence of zoning restrictions in the same sense that (so far as this

the denial of BBI's motion for preliminary injunctive relief in terms of its required likelihood of success on the merits.[13]

### Conclusion

If this were a moot court competition, BBI would certainly prevail, for the quality of its lawyering has been far better than City's. If the propriety of conduct of the litigants and their lawyers (a disturbing thing to have to mention at all) were the determining factor, again it must be said that City would suffer defeat. But neither of those things provides the rules of decision here, and for the reasons stated in this opinion BBI's motion for a preliminary injunction must be and is denied. This action is set for a next status hearing at 8:45 a.m. February 13, 1995, immediately after this Court's return from sitting with the Court of Appeals for the Ninth Circuit, to discuss the future of the litigation.[14]

### Appendix 1

This Court's foregoing opinion was already completed, and the final revised version was being transcribed for signature, on the afternoon of January 30, 1995 when City's counsel notified this Court and BBI's lawyers that on January 27 the ZBA had issued its ruling on BBI's application for a determination that it had satisfied the offstreet parking requirement for an adult use at its Top Shelf location. City's motion for leave to file a short additional brief together with a copy of the ZBA's ruling, which has been noticed up for presentation on February 1, is granted. This appendix deals briefly with the effect of the ZBA's ruling on this Court's opinion.

Although the ZBA's ruling turned BBI down, the decision was framed in terms of a denial of "the application for a Special Use"—the ZBA found that BBI's application for a determination of the parking issue as a discrete question, apart from the overall question of BBI's compliance with the Ordinance (a question that is known to have a negative answer to begin with), "appears to be a request for an advisory opinion which the Board has no authority to render." Having said that, the ZBA nonetheless dealt with the volatile situation before it, in which BBI's then parking lessor had served a notice of cancellation of the parking lease on January 19, 1995 (the ZBA hearing was on January 20).[1]

After the ZBA hearing had been concluded, on the final date of the Hearing before this Court (January 24), BBI introduced into evidence (as P.Ex. 10, admitted without objection by City) a new nine-year parking lease that BBI had entered into with a new lessor on January 20, immediately after the January 19 lease cancellation. Because

---

Court is aware) is in effect in every other urban area in the United States. Although the larger per-capita number of adult uses in Houston may demonstrate the substantially higher number that might operate where the supply and demand curves for adult uses reach equilibrium in an essentially free market, this Court is unaware of any authority that holds (or even suggests) that the Constitution requires adherence to a free-market model in that respect (just as Justice Holmes said in his famous dissent in *Lochner v. New York*, 198 U.S. 45, 75, 25 S.Ct. 539, 546–47, 49 L.Ed. 937 (1905) that "[t]he Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics"). Taken to its ultimate conclusion, such an approach would find all zoning restrictions unconstitutional.

**13.** This determination makes it unnecessary to address City's other arguments, poverty-stricken though they may be. Thus City's final Supp. Mem. 2–8 makes the empty argument that the prior proceeding that found BBI had not complied with offstreet parking requirements must

act as a bar to BBI's current action. That is simply nonsense—of course the existence of an independent and adequate state ground at one time *cannot* prevent a party from satisfying the requirement later and then seeking relief once again. As for the contention at Supp.Mem. 9–11 that the nondecision by the ZBA on offstreet parking somehow bars this action, that position (wrong in its inception) has been overtaken by events—see Appendix 1.

**14.** Among other matters the parties will be expected to address the offstreet parking issue in light of the ZBA's most recent ruling—see Appendix 1.

**1.** During the last day of the Hearing before this Court (January 24), BBI's counsel represented that both he and counsel for the then parking lessor had sought to complete the record as to the parking situation (apparently there was more to the story than the cancellation notice), but the ZBA's Chairman had refused to permit anything further.

**898**

there has obviously been no opportunity for the ZBA to address the sufficiency of that new lease to qualify as an accessory off-site parking lot under the Chicago Zoning Ordinance, and because this Court is also not in possession of sufficient information to rule on that issue, it cannot now be determined whether an adequate and independent state law ground exists for BBI's inability to operate an adult use at its Top Shelf location.

Accordingly City's alternative current motion for dismissal of BBI's Amended Complaint is denied. This action is not moot, and the foregoing opinion denying BBI's motion for a preliminary injunction will stand as written.

*Appendix 2*

As the early text of this opinion has said, City and its lawyers have actively—sometimes frantically—sought to avoid their constitutional accountability in this litigation. One of the tactical measures that City has adopted in that respect, plainly aimed at BBI and at its continuing efforts to obtain an adjudication of the constitutionality of the Ordinance's constraints, was the enactment of a 1994 amendment to the Ordinance to enlarge the zoning classifications that were nominally available for adult use establishments to include some added areas zoned for manufacturing. Quite apart from what appears to be the obvious economic undesirability or nonfeasibility of using most (if not all) of such added locations for that purpose (see n. 8), the amendment's nominal increase in available sites had the double goal of responding to one of BBI's attacks on the Ordinance and, as City's lawyers have repeatedly urged right up to and including their final submission (Supp.Mem. 1, filed January 25, 1995), of rendering this action moot.

It is possible that BBI, which the evidence on the current Hearing indicates has been bled dry by City's war of attrition, may have to abandon this litigation as a practical matter as a result of the current denial of preliminary injunctive relief. If so, City's mootness argument will itself become moot. But because (like the Hydra) that argument has again reared its dubious head, a moment or two may properly be devoted to City's contention.

When BBI first established the Top Shelf operation and when its controversy with City then first erupted, the 1993 version of the Ordinance was in effect. If BBI's legal arguments were sound so that the 1993 version were facially invalid, the Top Shelf operation would necessarily have been wholly legitimate (for by definition the "violation" of an unconstitutional ordinance is not a violation of the law). And the corollary of that proposition is that, with respect to any later ordinance enactment, Top Shelf was a *prior valid nonconforming use.*

But through the myopic lens of City's lawyers, the concept of "valid nonconforming use" can apply only to an operation that satisfied the demands of the earlier 1993 Ordinance—apparently even if that Ordinance were unconstitutional! If only counsel had devoted more time to objective analysis rather than to their constant efforts to escape substantive adjudication of the issues, they would necessarily have recognized that any such principle would spawn legal anarchy. It would then be possible for City to trigger mootness in perpetuity by constantly changing the Ordinance, so that—as in Zeno's Paradox—no litigant's arrow could ever reach the constitutional target.