Steven A. DIAMOND, Plaintiff,

v.

**CITY OF TAFT, Defendant.**

**No. CV–F 95–5774 AWI DLB.**

United States District Court,
E.D. California.

Oct. 30, 1998.

---

Roger Jon Diamond, Santa Monica, CA, for Plaintiff.

John D. Gibson, Gibson & Gibson, Bakersfield, CA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ISHII, District Judge.

In this action, the prospective owner of an adult bookstore challenges the constitutionality of a city zoning ordinance restricting locations in which sexually-oriented businesses may operate. Plaintiff Steven Diamond ("Diamond") contends that the ordinance denies him the opportunity to engage in protected First Amendment activity within the City of Taft ("the City"). He seeks a permanent injunction against enforcement of the ordinance as well as monetary relief.

The court has jurisdiction over this case under 28 U.S.C. § 1331.

The case was tried by the court, sitting without a jury, from January 14, 1998, through January 15, 1998. Closing arguments were heard on February 10, 1998. Roger J. Diamond, Esq., represented plaintiff and presented the testimony of Steven Pleasant ("Pleasant"), an expert witness, and plaintiff Steven Diamond. The City was represented by John D. Gibson, Esq. Expert witness Lloyd Zola ("Zola") testified on behalf of the City.

The court has considered the testimony and examined the exhibits, trial briefs and post-trial briefs offered by the parties, and now submits its Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

*Uncontested Facts* (See Pretrial Order, 2:3–5:5; Pl. Trial Br., 1:27–28.)

1. On or about December 2, 1986, the City of Taft, through its city council, adopted Ordinance 524, entitled, "Adult Entertainment Businesses," and codified as Chapter 25 of Title VI of the Taft Municipal Code. The stated purpose of Ordinance 524 was to "prevent the deleterious effects of adult entertainment businesses upon the community by insuring proper location of adult entertainment businesses through the zoning process." Chapter 25 of Title VI allowed the adult entertainment businesses to be located in zones designated as Commercial–1 (C1), Commercial–2 (C2), Manufacturing–1 (M1) or Manufacturing–2 (M2) and prohibited the location of adult entertainment businesses within 1000 feet of residential property, any other adult entertainment business, any public or duly licensed private school or college, or within 500 feet of any park or public playground, public library, church or other religious facility.

2. On or about November 17, 1992, the City amended Chapter 25, Title VI of the Taft Municipal Code regulating adult entertainment businesses.

3. In late 1994, the City embarked on a comprehensive zoning update project which included the analysis and categorization of all zoning and planning including, but not limited to, all chapters of Title VI ("Planning and Zoning") of the Taft Municipal Code. The comprehensive zoning update project concerning the residential zoning aspects was completed in January 1995. The comprehensive zoning update project then proceeded to the analysis of industrial (manufacturing) zoning which, in part, includes adult entertainment businesses.

4. On March 7, 1995, the City enacted an urgency ordinance, Ordinance No. 6595, adopting a new Chapter 25, Title VI, of the Taft Municipal Code concerning adult entertainment businesses. The amended Chapter 25 of Title VI of the Taft Municipal Code addressed the adult entertainment business zoning issues in greater detail than its predecessor.

5. As a result of other codification changes in Title VI of the Taft Municipal Code, the City changed the adult entertainment business ordinance from Chapter 25 of Title VI to Chapter 31 of Title VI.

6. On or about March 28, 1995, in order to ensure the continuity of the zoning and planning ordinances, the Taft Planning Commission held public hearing and review of the ordinances. The Commission received no in-

quiries or correspondence at their hearing and review, and there were no persons at the hearing who wished to speak for or against the proposed ordinances. The Planning Commission then moved to recommend that the City Council adopt the ordinance. On or about April 4, 1995, the City Council adopted Ordinance No. 62795 adopting a new Chapter 31 of Title VI of the Taft Municipal Code concerning adult entertainment business.

7. The zoning ordinance now applicable to Diamond in this case—Chapter 31, Title VI, Taft Municipal Code—provides that "adult entertainment businesses" are permissible only in zones designated C–1, C–2, M–1, and M–2, and may not be located within 1000 feet of any area zoned for residential use, any other adult entertainment business, any public or private school, park, playground, public building, church, any commercial establishment operated by a bona fide religious organization, or any establishment "likely to be used by minors." Furthermore, a conditional use permit ("CUP") must be approved by the City Council for any prospective adult entertainment business location which conforms to the zoning and distance requirements. *See* Taft, CA, Code §§ 6–31–3, 6–31–4. There is no dispute that Diamond's proposed use constitutes an "adult entertainment business" within the meaning of the ordinance.

8. Despite the zoning prohibitions, Diamond requested and filed for a conditional use permit to use the property located at 419, 421, and 423 Center Street, Taft as an adult entertainment business. On or about May 23, 1995, a properly noticed and publicized public hearing was held by the Planning Commission with respect to Conditional Use Permit # 57 sought by Diamond. At this hearing no proponents appeared and it was found that the proposed adult entertainment business property was located within 1000 feet of parks, churches and residential uses. It was additionally found that the proposed project may, or would, have some deleterious effects on the surrounding business community, parks, churches and residences. Based on these findings, and others, the Taft Planning Commission denied Diamond a conditional use permit.

9. Diamond's appeal of the denial of the CUP was rejected by the Taft City Council.

*Factual Contentions of the Parties*

10. Diamond contends that the Taft ordinance does not allow a reasonable number of suitable locations within Taft for the operation of his business. Pleasant testified at trial that all the proposed sites within the city are either definitionally unavailable under the ordinance or outside the relevant real estate market. In addition, Diamond asserts that the CUP requirement which applies to all prospective adult business locations disqualifies each proposed site as a reasonable alternative location.

11. At trial, the City claimed that there were twenty reasonable alternative locations for an adult business. Zola testified to the availability and suitability of these sites.

12. The parties submitted photographs and detailed maps of the City of Taft and the proposed sites.

*Prefatory Facts*

13. Taft is a rural town, approximately 16 square miles in size. The population within the city limits is approximately 6800 and the population both within Taft and in the area immediately surrounding it is approximately 13,000. The developed area of the city covers approximately two square miles, or 1200 acres. It is possible to travel from one end of the developed area of the city to the other in a matter of minutes.

14. A K–Mart store is located just outside the southeast corner of the developed area of Taft, near Gardner Field Road and State Highway 33. K–Mart is a major commercial center in Taft, which is frequently used by minors. Diamond presented undisputed evidence that K–Mart sells merchandise for children and adolescents and caters to a clientele of all ages. It contains "a large toy store, . . . a large clothing area for minors, . . . a food area, [and] . . . coin operated play apparatus." Reporter's Transcript of Proceedings, 392:13–23 [hereinafter RT]. Evidence was presented indicating that even during the morning hours of a school day, minors congregate in the vicinity of the store. *See* RT, 393:4–7.

15. Based on the limited evidence presented, the court finds that no adult entertainment business currently operates in Taft and no prospective adult entertainment business, other than Diamond's, has ever applied for a permit to operate in Taft.

*The Proposed Sites*

16. **Sites # 1-6:**[1] **1555 and 1589 Kern Street;**[2] **1537 Kern Street; 1515 Kern Street; APN 32–600–14 (no address); 1410 Kern Street; 1310 Kern Street**

Sites # 1—6 are all situated in close proximity to one another along Kern Street and are all within the same general area of the northwest corner of Taft, just inside the city limits. These sites are located in a manufacturing zone (M–2) and are accessible to the public via Kern Street, which forms part of State Highway 33 and connects other areas of Kern County to the center of Taft along one continuous, paved roadway. Although the sites are not within the population center of Taft, they are still reasonably accessible to the public given the small size and compactness of the developed area of the city.

All six sites meet the infrastructure needs of a commercial establishment in Taft. They are serviced by a main road, and power and water are available. While sewage disposal is handled by septic tanks rather than sewers, there is no reason to believe this method of disposal is inadequate. Sidewalks and street lights are not present in the vicinity of the site. However, given the rural nature of this outlying area of Taft, sidewalks are not as essential for convenience or safety as they might be in the downtown area of the city. Public lighting is also not essential since it can be presumed, especially with respect to

stand-alone buildings as are present in this area, that lighting for the property will be provided by either the landlord or the tenant of the property.[3]

The sites are all potentially available for use by a commercial enterprise. Although sites # 1, 2, 3, and 6 are currently occupied by buildings housing industrial businesses, no reliable evidence was presented to establish the length of the lease terms or the likelihood that the properties would not soon be available for lease. The only evidence offered in this regard concerned site # 6, currently occupied by the Kern Electric and Supply Company. Pleasant presented testimony, based on a telephone conversation with an unidentified employee of Kern Electric and Supply, that the company had been in business since 1970 and had no plans to relocate. RT, 420:20–25. However, Pleasant could specify neither the identity nor the authority of the employee with whom he spoke. Furthermore, Pleasant testified that he did not inquire as to whether there was a long term lease on the property. RT, 423:8. There is, therefore, insufficient evidence to support Diamond's inference that the site is not likely to become available in the near future. It is not unreasonable to believe that this, or any of the six sites could ever become available to a commercial enterprise.

The court also finds that each of these sites is suited to some generic commercial enterprise. Although there are currently no retail businesses in their immediate vicinity, the area does have retail potential. The site is situated on a well-traveled state highway leading into the center of the city. The nearby oil fields to the northwest of Taft generate traffic on Kern Street. Further-

1. Sites are numbered in accordance with Diamond's Exhibit 107. The addresses and assessor parcel numbers provided by Pleasant and Zola purporting to correspond to these sites were not entirely consistent with one another.

2. Although this site maintains two buildings with two separate addresses, it constitutes one parcel of land and has one "Assessor Parcel Number." As such, the court treats it as one site for the purposes of its analysis.

3. Zola testified that these sites have all the infrastructure required by the City of Taft and thus the lack of public lighting and sidewalks does not

necessarily disqualify these sites under *Topanga Press, Inc., v. City of Los Angeles,* 989 F.2d 1524, 1531 (9th Cir.1993), *cert. denied, City of Los Angeles v. Topanga Press, Inc.,* 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994). At trial, Diamond objected to Zola's testimony regarding the City's infrastructure requirements in this area, claiming that any evidence of any such requirements (or lack thereof) should be presented in the form of the City's written regulations. In light of the court's independent analysis of the adequacy of this area's infrastructure, the court need not address the merits of Zola's argument or Diamond's objection.

more, business has been expanding on Kern Street from the city center to the northwest, where the sites are located.

None of the sites is located within 1000 feet of any other adult entertainment business, any public or private school, park, playground, public building, church, any commercial establishment operated by a bona fide religious organization, or any establishment likely to be used by minors. Despite Diamond's assertion to the contrary, the sites are also not within 1000 feet of any area zoned for residential use. Pleasant indicated in his original April 1996 report[4] that this site was less than 1000 feet from an area on the north side of Kern Street designated low-density residential by Taft's General Plan (although Pleasant agreed that the area in which the sites themselves are located is zoned for manufacturing use). His subsequent report,[5] however, makes no reference to this designation in the General Plan and does not assert that it is a disqualifying factor for the site. Furthermore, Pleasant's testimony at trial suggested that his opinion regarding the General Plan's designation of this area had changed since the preparation of his April 1996 report.[6] RT, 56:3–22, 61:20–22, 63:20–64:21. Finally, Zola testified that any discrepancy between the General Plan and the zoning code which might have indicated a future residential designation for this area was resolved by amendments to the General Plan in 1986. RT, 165:9–14. Based on all the above evidence, the court finds that the site is not within 1000 feet of any area zoned for residential use.

As already noted, sites # 1—6 are all located in close proximity to one another along Kern Street. Although no direct testimony was presented on the precise distances between these sites,[7] and the evidence on this point is not altogether reconcilable, the court finds, based on Zola's report as well as the maps and aerial photographs provided by the parties, that the distance between sites # 1 and 6—the sites farthest apart from each other geographically—is more than 1000 feet but less than 2000 feet. *See* City's Exhibit "A" at p. 9 (stating that, in light of the 1000–foot distance requirement between adult uses, the only sites available for simultaneous use would be site # 1) (APN 32–600–12) and site # 6 (APN 32–600–17); *compare* Diamond's Exhibits 107 and 103–B with City's Exhibit "C."

17. Sites # 7–11:[8] APN (Pleasant) 627–95–2 a.k.a. APN (Zola) 220–290–2; APN (Pleasant) 627–95–3 a.k.a. APN (Zola) 220–290–3; APN (Pleasant) 627–95–4 a.k.a. APN (Zola) 220–290–4; APN (Pleasant) 627–95–5 a.k.a. APN (Zola) 220–290–5; APN (Pleasant) 627–95–6 a.k.a. APN (Zola) 220–290–6

All five sites are zoned for commercial use (C–2) and are potentially available for use by a commercial enterprise. Because the sites are presently vacant of buildings and tenants it is not unreasonable to believe that they could become available to a commercial enterprise.

All five sites are suited to some commercial enterprise. All are serviced by two state highways (33 and 119) and a road leading into the center of Taft (Gardner Field Road). They are near a major commercial center in Taft (K–Mart). No evidence was presented by either party suggesting that any of these sites was commercially unsuitable.

Each site is within 1000 feet of an area immediately to the west of the site designated in Taft's General Plan to be zoned for residential use. This area to the west of the sites is outside the city limits of Taft but within the City's "Sphere of Influence." Al-

---

4. Admitted into evidence as Diamond's Exhibit 110.

5. Admitted into evidence as Diamond's Exhibit 102.

6. Pleasant's testimony on this point was confused and inconclusive.

7. Zola did testify that the two properties which comprise Site # 1—1555 and 1589 Kern Street—

are within 1000 feet of each other. RT, 156:11–13.

8. Because these are zoned for commercial use there is no need for the court to make factual findings regarding access and infrastructure available to these sites. Such findings are necessary for the purposes of the *Topanga Press* analysis only where the proposed site is in a manufacturing or industrial zone. *See Topanga Press,* 989 F.2d at 1531.

though Pleasant's testimony regarding Taft's General Plan indicated that this area, if eventually incorporated into the city, would be zoned for residential use, it is not now zoned for such use.

Each site is within 1000 feet of the K–Mart store.

18. **Sites # 12–16: 301 Commerce Way (APN 220–280–8); 310 Commerce Way (APN 220–280–9); APN 220–280–10; 333 Commerce Way (APN 220–280–12); 301 Commerce Way (APN 220–280–14)**

All five sites are zoned for industrial use (M–2). They are each located within 1000 feet of a public building—the Taft police station and detention facility—and within 1000 feet of the K–Mart store.

19. **Site # 17: APN 220–280–1:**

The site is in a manufacturing park zone (MP) and is located within 1000 feet of a public building—the Taft police station and detention facility. At trial, Zola conceded that this site was not available for adult business use. RT, 256:25—257:5.

20. **Sites # 18–20: 310 Industrial Way (APN 220–280–2); 320 Industrial Way (APN 220–280–3); 330 Industrial Way (APN 220–280–4)**

All three sites are zoned for industrial use (M–2). They are each located within 1000 feet of a public building—the Taft police station and detention facility.

21. **Site # 21: APN 220–020–12**

The site is zoned for industrial use (M–2). It has proper access via Ash Street and Airport Road, a main thoroughfare connecting Bakersfield to the eastern edge of the population center of Taft. Although the site is not within the population center of Taft, it is still reasonably accessible to the public given the small size and compactness of the city.

The site meets the infrastructure needs of a commercial establishment in Taft. The site is serviced by a main road, and power, water and sewers are available. Sidewalks and street lights are not present in the vicinity of the site. However, as with sites # 1–6, the rural nature of this outlying area makes sidewalks an amenity that is less essential for convenience or safety than it might be in the downtown area of Taft or in a larger city. Public lighting is also not necessary since it can be presumed that lighting will be provided by the either the landlord or the tenant of the property.

The site is presently vacant of buildings and tenants. Although it is adjacent to a sewage disposal area, it constitutes a separate and distinct parcel of land. It is therefore not unreasonable to believe that the site could ever become available to a commercial enterprise.

The site is suited to some generic commercial enterprise. Although the immediately surrounding area is removed from most residential, commercial, and even industrial uses, the site is within a short traveling distance of the center of Taft and is located on a major thoroughfare. And while the commercial viability of a business occupying the site might be dependent on the future development of adjacent areas, there is no evidence that the site is commercially unsuitable.

22. **Site at State Highway 33 and Gardner Field Road** (not listed on Diamond's Exhibit 107): This site is within 1000 feet of both a residential zone and a park. Zola conceded that this site is unavailable under *Topanga Press, Inc., v. City of Los Angeles*, 989 F.2d 1524, 1531 (9th Cir.1993).

23. **Site at State Highway 33 and Petroleum Club Road** (not listed on Diamond's Exhibit 107): This site is within 1000 feet of a residential zone. Zola conceded its unavailability under *Topanga Press*. RT, 152:12–16.

24. **660 Acres East and Southeast of State Highway 33** (not listed on Diamond's Exhibit 107): According to Zola, this site is undeveloped, has no utilities and is inaccessible to the general public. It is therefore unavailable under *Topanga Press*. RT, 152:12–16.

25. The City presented evidence, and the court now finds, that the conditions of each of the above sites, as well as the availability of those sites, have remained substantially the same from the time of commencement of the instant action in 1995 through the time of trial.

## CONCLUSIONS OF LAW

The City's zoning ordinance constitutes a limitation on the areas in which adult uses may locate, rather than an outright ban on such uses. The ordinance is therefore analyzed as a "time, place and manner" regulation. *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). By its terms, the ordinance is designed to combat the harmful secondary effects of the clustering of adult entertainment businesses rather than to regulate the content of protected speech.[9] *See* Taft, CA, Code § 6–31–1. The stated purpose of the ordinance is to minimize "blighting and downgrading," and preserve the integrity of adjacent residential and commercial areas. *Id.* Because the regulation is "justified without reference to the content of the regulated speech," the ordinance is reviewed under the standards applicable to "content-neutral" time, place and manner restrictions. *Renton,* 475 U.S. at 48–49, 106 S.Ct. 925. Accordingly, in order to pass constitutional muster the ordinance must: 1) be designed to serve a substantial government interest unrelated to the suppression of ideas; and 2) allow for reasonable alternative avenues of communication.[10] *Id.* at 50, 106 S.Ct. 925.

### I. Substantial Government Interest

"A city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.'" *Id.* at 50, 106 S.Ct. 925 (quoting *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976))(plurality opinion). In *Renton,* the Supreme Court characterized the city's interest in "generally protect[ing] and preserv[ing] the quality of the city's neighborhoods, commercial districts, and the quality of urban life" as "vital." *See Renton,* 475 U.S. at 48, 50, 106 S.Ct. 925. The Ninth Circuit has also recognized municipalities' "substantial interest in preventing the deleterious secondary effects often associated with adult theaters." *Tollis, Inc. v. San Bernardino County,* 827 F.2d 1329, 1332 (9th Cir.1987); *accord Buzzetti v. City of New York,* 140 F.3d 134, 140 (2d Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 54, 142 L.Ed.2d 42 (1998).

The City's ordinance implicates similar government interests in attempting to protect residential and commercial communities from "blighting and downgrading" and thereby "preserve their integrity." *See* Taft, CA, Code § 6–31–1. The City's Planning Commission conducted a public hearing and review of the ordinance and the City Council found that "certain adult-oriented businesses, because of their very nature are recognized as having deleterious effects upon adjacent residential and commercial areas when located in close proximity to one another." *Id.;* Pretrial Order, 4:1–11; Joint Pretrial Statement, 3:10–17. While Diamond nominally challenged the City's proffered interest in regulating adult businesses, he presented no evidence disputing the City Council's finding or questioning its exercise of legislative judgment. Finally, the method chosen by the City to further these interests—placing locational restrictions on adult businesses in order to disperse them throughout the city—was explicitly endorsed by the *Renton* court. *See Renton,* 475 U.S. at 52, 106 S.Ct. 925. Accordingly, the court holds that the Taft ordinance is designed to further a substantial government interest unrelated to the suppression of ideas.

### II. Reasonable Alternative Avenues of Communication

The court must thus address the issue upon which the parties have most heavily focused their attention throughout this litiga-

---

9. The City does not dispute that the adult entertainment offered by Diamond is protected by the First Amendment.

10. Diamond has never suggested that the ordinance fails to meet the other requirements of content-neutral time, place and manner restrictions set forth in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) and mentioned in *Renton. Renton,* 475 U.S. at 52, 106 S.Ct. 925; *see also Project 80's, Inc. v. City of Pocatello,* 876 F.2d 711, 717 (9th Cir.1988)("Renton did not discard the requirement that content-neutral time, place and manner restrictions employ means no more restrictive than necessary to serve the governmental interest."). Specifically, Diamond has not disputed that the ordinance is narrowly tailored to achieve a legitimate end.

tion—whether, despite its restrictions, the ordinance provides adult entertainment businesses with reasonable alternative avenues of communication. In the context of zoning systems which regulate adult businesses, a local government may not " 'effectively den[y] ... [the Adult Businesses] a reasonable opportunity to open and operate' their enterprise within the city in question." *Topanga Press,* 989 F.2d at 1529 (quoting *Renton,* 475 U.S. at 54, 106 S.Ct. 925). The Ninth Circuit has held that this condition is satisfied if: 1) relocation sites provided to a business may be considered part of an actual business real estate market; and 2) after excluding those sites that may not properly be considered to be part of the relevant real estate market, there are an adequate number of potential relocation sites. *Topanga Press,* 989 F.2d at 1530.

### A. Sites Within the Relevant Real Estate Market

The Topanga court noted five factors to consider in determining whether a specific relocation site is available. First, a relocation site is not available "when it is unreasonable to believe that it would ever become available to any commercial enterprise." *Id.* at 1531. Second, relocation sites in manufacturing zones that are "reasonably accessible to the general public may also be part of the market." *Id.* Third, "areas in manufacturing zones which have a proper infra-structure such as sidewalks, roads and lighting may be included in the market." *Id.* Fourth, potential sites must "suit[ ] some generic commercial enterprise, although not every particular enterprise ... before they can be considered part of the relevant market." *Id.* Finally, "those relocation sites which are commercially zoned are part of the market." *Id.*

In addition to satisfying these criteria, the proposed site must, of course, be definitionally available under the terms of the zoning ordinance at issue. *See id.* at 1531–32 (conducting relevant market analysis after excluding definitionally unavailable sites). Thus, in order to be included in the relevant market, the site must meet all the locational restrictions of section 6–31–4 of the Taft Municipal Code.

### 1. Sites # 1–6

 Based on the above findings, sites # 1–6 meet all the criteria for inclusion in the relevant real estate market. Although not zoned for commercial use, the sites are suited to some commercial business and could become available to such a business at any time. They are easily accessible to the public and provide adequate infrastructure considering Taft's small size and rural character. On this latter point, the court is unpersuaded that the absence of sidewalks and street lights operates as an automatic bar to inclusion in the relevant market. In referring to "sidewalks, roads and lighting," *Topanga Press* was providing examples of the type of infrastructure elements which should inform the court's inquiry, rather than imposing absolute requirements to be inflexibly applied. *Id.* at 1531, 1533 (referring to "proper infrastructure such as ..."). In the court's view, *Topanga Press* is most properly read as mandating a case-by-case determination of the overall adequacy of an area's infrastructure, considering all relevant elements as well as the likely infrastructure needs of a business given its locale. For this reason, the court has considered not only those elements specifically mentioned by *Topanga Press*—sidewalks, roads and lighting—but also power, water and sewage disposal, all of which are available to these sites.

Although many of these sites are occupied by industrial buildings, no evidence was presented to suggest that the sites' physical characteristics are "totally incompatible with any average commercial business," as was the case in *Topanga Press. See id.* at 1532. Nor was there any evidence of the cost of altering or developing the sites to change their physical characteristics. *See id.* at 1530. Furthermore, as explained in the Findings of Fact, these sites do not conflict with the ordinance's locational restrictions regarding neighboring residential uses. All six sites are therefore definitionally available under the city's zoning ordinance and within the relevant real estate market.

That most of these sites are currently occupied by other businesses and may be subject to long-term leases is not particularly

relevant to the court's analysis. Testimony that "no one would sell or lease property on which [an adult business] could relocate ... [is] irrelevant to the First Amendment inquiry." *Alexander v. City of Minneapolis*, 928 F.2d 278, 283 (8th Cir.1991); *3570 East Foothill Blvd., Inc. v. City of Pasadena*, 912 F.Supp. 1257 (C.D.Cal.1995), *aff'd, 3570 Foothill Blvd. Inc. v. City of Pasadena*, 99 F.3d 1147 (9th Cir.1996) [hereinafter *"3570 Foothill I"*]; *see also Topanga Press*, 989 F.2d at 1531. The *Renton* court deemed immaterial the fact that in that case "'practically none' of the undeveloped land [was] currently for sale or lease." *See Renton*, 475 U.S. at 53–54, 106 S.Ct. 925. Here, there was no reliable indication of the length of the lease terms on the properties nor any evidence that their availability is not a "genuine possibility." *See Topanga Press*, 989 F.2d at 1531(stating that the "requirement of potentiality connotes genuine possibility"). The court thus cannot say that it would be "unreasonable to believe that [they] would ever become available to any commercial enterprise." *Topanga Press*, 989 F.2d at 1531.

Nor does the court find compelling, particularly in this case, the evidence that these sites are somewhat geographically removed from the commercial center of Taft. *See Woodall v. City of El Paso*, 49 F.3d 1120, 1126 (5th Cir.), *cert. denied*, 516 U.S. 988, 116 S.Ct. 516, 133 L.Ed.2d 425 (1995)(*Renton* analysis does not involve determination of sites' proximity to commercial development); *D.G. Restaurant Corp. v. City of Myrtle Beach*, 953 F.2d 140, 147 (4th Cir.1991)(upholding ordinance that restricted adult businesses to "a few poorly lit sites in industrial areas, far from the tourist-oriented businesses."). Taft is a small town, which can be crossed by car in a matter of minutes. In a community of Taft's compact size, the location of these sites at the outer edges of the city's developed area would hardly consign a commercial business situated on them to isolation. As already mentioned, all these sites are situated on a well-traveled state highway leading into the center of Taft and are accessible to incoming visitors as well as city residents. The court therefore concludes that sites # 1–6 are within the relevant real estate market under *Topanga Press*.

### 2. Sites # 7–11

These sites are not part of the relevant market. As sites zoned for commercial use, they are assumed to possess the infrastructure and accessibility required for inclusion in the relevant market. *Topanga Press*, 989 F.2d at 1531. These sites are, however, definitionally unavailable under the Taft ordinance because of their proximity to "an establishment likely to be used by minors"— the K–Mart store. *See* Taft, CA, Code, § 6–31–4(A)(3).

For two reasons, the court must construe the K–Mart as meeting this description under the Taft ordinance. First, Diamond produced undisputed evidence that the K–Mart in Taft is a business which caters, at least in part, to a clientele of minor age and which is in fact visited by minors. Under the terms of the ordinance, the 1000–foot buffer requirement is triggered not merely by establishments that are used exclusively by minors, but by all those "likely to be used by minors." The facts, in light of the plain language of the ordinance, suggest that the K–Mart comes within the meaning of this term.

Second, the enumeration of other sensitive uses in the ordinance militates against the conclusion that the term is meant to refer only to establishments which are used solely, or at least primarily, by minors. Those establishments designed for the exclusive or predominant use of minors—such as playgrounds, schools, and parks—are separately listed by the ordinance. Other establishments intended for use by the general public but most likely susceptible of use by children—residences, religious establishments and public buildings [11]—are also specifically mentioned. Given the separate listing of these establishments, and the absence of any limitation on the type of "establishment likely to be used by minors," the ordinance neces-

11. For the purposes of this argument, the court assumes the correctness of the City's interpretation of the term "public buildings" as referring solely to buildings which are publicly owned or operated rather than to all buildings open to the public.

sarily includes commercial establishments that are likely to be used by minors. Since all other immediately apparent "likely uses by minors" have already been mentioned by the ordinance, the ordinance must have intended to include commercial establishments, such as the K–Mart, that cater to minors through games, music, clothing, and food. Accordingly, because sites 7 through 11 are within 1000 feet of an "establishment likely to be used by minors," they are unavailable under the terms of the ordinance and therefore ineligible for inclusion in the relevant real estate market.[12]

### 3. Sites # 12–16

For similar reasons, sites # 12–16 are not within the relevant market. All are located within 1000 feet of two sensitive uses—the police station and detention facility and the K–Mart store. The City does not dispute, and the court agrees, that the police station and detention facility constitute a "public building" within the meaning of the ordinance. The K–Mart store, as an "establishment likely to be used by minors," also constitutes a sensitive use under the ordinance. Because the ordinance prohibits the location of adult businesses within 1000 feet of these uses the sites are definitionally unavailable under the ordinance and must be excluded from the relevant market.

### 4. Site # 17

This site is not fit for inclusion in the relevant market. It is within 1000 feet of a the police station and detention facility—a "public building" under the ordinance. Zola conceded that this site was not available for adult business use.

### 5. Sites # 18–20

These sites must also be excluded from the relevant market. They are definitionally unavailable because they are all located within 1000 feet of the Taft police station and detention facility, which is designated as a sensitive use under the ordinance.

### 6. Site # 21

 This site is within the relevant market. Although the site is zoned for industrial use, it is sufficiently accessible to the population center of Taft by a main road and meets the infrastructure needs of a commercial establishment in a rural community such as Taft. The site is potentially available for use by, and suited to the needs of, a generic commercial enterprise. The fact that the site is situated on undeveloped land does not automatically exclude it from the relevant market. In *Renton,* the Supreme Court deemed acceptable land that consisted of " '[a]mple, accessible real estate,' including 'acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that is crisscrossed by freeways, highways, and roads.' " *Renton,* 475 U.S. at 53, 106 S.Ct. 925 (quoting district court's findings).

The site's mere proximity to a sewage treatment facility is also not an excluding factor under *Topanga Press.* There, the court concluded that "whether one defines a warehouse, a swamp, or a sewage treatment plant as physically or economically unsuitable, it is not reasonable to define these sites as part of the real estate market that any business would choose." *Topanga Press,* 989 F.2d at 1531. In the case at bench, however, site # 21 consists of a parcel of land distinct from the sewage treatment plant. It contains none of the disabling characteristics or uses such as shipping yards, airports or oil refineries that the *Topanga Press* court deemed inherently incompatible with commercial use. Accordingly, the court concludes, based on all the above factors, that this site is part of an actual market for commercial enterprises generally. *See Topanga Press,* 989 F.2d at 1531.

 Finally, while this site may not be the most attractive site as a matter of business judgment, the commercial viability of an adult entertainment business locating there may not be considered by the court in performing the *Renton* analysis. *See American*

---

**12.** In light of the disqualification of all these sites on this ground, the court need not decide whether they are also definitionally unavailable be-

cause of their proximity to an area within Taft's "Sphere of Influence," designated to be zoned residential in the Taft General Plan.

*Mini Theatres,* 427 U.S. at 78, 96 S.Ct. 2440 (Powell, J., concurring) ("The inquiry for First Amendment purposes is not concerned with economic impact"); *Lakeland Lounge of Jackson, Inc. v. City of Jackson, Miss.,* 973 F.2d 1255, 1260 (5th Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 469 (1993) ("The fact that these locations do not seem particularly desirable for economic reasons does not matter."). Once a relocation site is determined to be part of the relevant market "it is not relevant whether [it] will result in lost profits, higher overhead costs, or even prove to be commercially infeasible for an adult business." *Topanga Press,* 989 F.2d at 1531; *see also Spokane Arcade, Inc. v. City of Spokane,* 75 F.3d 663, 666 (9th Cir.1996)("In Topanga, we maintained that in the absence of any absolute bar to the market (in that case, relocation to a site that would deny a business the opportunity to open and operate), it is irrelevant whether " '[a regulation] will result in lost profits, higher overhead costs, or even prove to be commercially unfeasible for an adult business.' ").

### 7. Other Sites

Although at trial the City seemed to abandon the following sites as commercially unsuitable, the court briefly addresses their unavailability.

*a. Site at State Highway 33 and Gardner Field Road:* This site is definitionally unavailable because it is within 1000 feet of both a residential zone and a park. Zola conceded that it is unavailable under *Topanga Press.*

*b. Site at State Highway 33 and Petroleum Club Road:* This site is also definitionally unavailable because it is within 1000 feet of a residential zone. Zola conceded its unavailability under *Topanga Press.*

*c. 660 Acres East and Southeast of State Highway 33:* This site cannot be included within the relevant market. According to Zola, this site is undeveloped, has no utilities and is inaccessible to the general public.

Zola conceded that it must be excluded from the relevant market.

Thus, without taking into account the required 1000–foot buffer between adult uses, seven sites are available to any one adult business—sites # 1–6 and 21. The crucial question, however, is not how many sites are available, but how many sites could operate simultaneously given the distance requirements between adult businesses mandated by the ordinance. *Walnut Properties, Inc. v. City of Whittier,* 861 F.2d 1102, 1108 (9th Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 157 (1989); *Topanga Press,* 989 F.2d at 1533 ("There is no doubt that the 1000 foot restriction between any two adult businesses would severely reduce the actual number of potentially available relocation sites."); *Woodall v. City of El Paso,* 49 F.3d at 1125 ("What is important is the number of adult business locations that the acreage will support given the spacing requirements. That is what determines whether there are sufficient alternative sites available . . ."); *3570 East Foothill Blvd. I,* 912 F.Supp. at 1265; *Young v. City of Simi Valley,* 977 F.Supp. 1017, 1021 (C.D.Cal. 1997); *BBI Enterprises, Inc. v. City of Chicago,* 874 F.Supp. 890, 896 (N.D.Ill.1995). Here, as in *Walnut Properties,* the ordinance imposes a 1000–foot separation requirement between any two adult businesses, thereby preventing the concentration of such businesses in a given area. *See* Taft, CA, Code § 6–31–4(A)(2). Sites # 1–6 are clustered together along Kern Street in northwest Taft. Based on the limited, and at times conflicting evidence presented, the court concludes that no more than two adult businesses could coexist in this area under the ordinance.[13] *See* City's Exhibit "A" at p. 9 (stating that, in light of the 1000–foot distance requirement between adult uses, the only sites available for simultaneous use would be site # 1 (APN 32–600–12) and site # 6 (APN 32–600–17)); *compare* Diamond's Exhibits 107 and 103–B with the City's Exhibit "C." Thus, counting site # 21, the total number of sites that are capable of simulta-

---

**13.** The City conceded that its map of this area - admitted as Exhibit "C"—did not accurately portray the distances between the sites.

neous adult entertainment use in Taft is three.

### B. Sufficiency of Sites Within Relevant Real Estate Market

The court must next determine whether this number of potential sites adequately provides "reasonable alternative avenues of communication." *Topanga Press*, 989 F.2d at 1530. As cases have pointed out, there is no constitutional minimum number of sites which a government regulation must allow. *Lakeland*, 973 F.2d at 1260 ("there is no requirement in Renton ... that a specific proportion of a municipality be open for adult businesses or that a certain number of sites be available."); *3570 East Foothill Blvd. I*, 912 F.Supp. at 1264 (no "bright line rule for determining whether or not a city has provided 'a reasonable opportunity to open and operate an adult [business]'; ... a court must look to the facts of each case"). Courts have looked to a variety of a factors in assessing the sufficiency of available sites, including the "the percentage of land theoretically available to adult businesses, the number of sites potentially available in relation to the population of the city, the number of sites compared with the existing number of adult businesses, or the number of businesses desiring to offer adult entertainment." [14] *3570 East Foothill Blvd. I*, 912 F.Supp. at 1265 (citing *Woodall*, 49 F.3d at 1127; *Alexander*, 928 F.2d at 283; and *BBI Enterprises*, 874 F.Supp. at 896).

In *Woodall*, the court concluded that the presence of forty available sites for thirty-nine existing adult businesses established, "as a matter of arithmetic," that there were "more 'reasonable' sites available than businesses with demands for them," and thus that the ordinance at issue afforded the adult businesses adequate alternative means of communication. *Woodall*, 49 F.3d at 1127. Similarly, in *Lakeland*, the court looked to the demand for adult business sites in determining the sufficiency of their number. There the court held that because an ordinance allowed more reasonable sites than

businesses seeking to operate, it did not reduce the number of establishments that could open in the city, and therefore did not limit expression. *Lakeland*, 973 F.2d at 1260. Finally, *Topanga Press* suggested in dicta that a zoning scheme which provides a greater number of alternative sites than there are adult businesses in operation would probably pass constitutional muster. The court surmised that in that case, were it not for the 1000–foot buffer requirement between adult uses, the 120 sites available for 102 adult businesses then existing in the city might be constitutionally sufficient. *Topanga Press*, 989 F.2d at 1533. Here, the one adult business in Taft is left with three alternative sites even after the 1000–foot buffer requirement is taken into account.

Implicit in such cases, as well as in *Walnut Properties*, is recognition of the longstanding principle that within the First Amendment marketplace both the producers and the consumers of ideas are entitled to protection. *See e.g. Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 386, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Coun., Inc.*, 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). In *Walnut Properties*, the court looked to the number of adult businesses that could coexist under the ordinance even though Whittier contained only one such business at the time. *Walnut Properties, Inc. v. City of Whittier*, 861 F.2d at 1108. Were the court to consider the effect of the ordinance merely on Diamond, there would be little doubt, in the court's view, that the existence of seven available sites does not effectively deny him a reasonable opportunity to locate in Taft. But the proper inquiry here involves a consideration of the world of adult entertainment producers. To be sure, *Renton* and its progeny make clear that not every prospective adult business must be guaranteed the opportunity to operate within a city at the location of its choosing. However, the requirement that courts consider the potential

---

**14.** In the instant case, the parties have offered no evidence of the percentage of land available to adult entertainment businesses.

acreage or number of sites capable of simultaneous use ensures the protection of purveyors of sexually-oriented materials as a group. *See id.; Topanga Press,* 989 F.2d at 1533; *Woodall v. City of El Paso,* 49 F.3d at 1125; *3570 East Foothill Blvd. I,* 912 F.Supp. at 1264; *Young v. City of Simi Valley,* 977 F.Supp. at 1021; *BBI Enterprises, Inc. v. City of Chicago,* 874 F.Supp. at 896. And, it is also sensitive to the rights of their prospective audience. *BBI Enterprises,* 874 F.Supp. at 895–96. Without considering both producer supply and consumer demand, there can be no meaningful determination of whether the First Amendment's purposes in guaranteeing reasonable alternative avenues of communication are satisfied. *See American Mini Theatres,* 427 U.S. at 77, 96 S.Ct. 2440 (Powell, J., concurring)(stating, in context of adult business zoning, that "the central First Amendment concern remains the need to maintain free access of the public to the expression"). In the present case, the parties have offered no direct evidence of Taft's consumer demand for sexually-oriented materials. In applying the above-mentioned principles, therefore, the court's judgment is necessarily informed by the inferences that may justifiably be drawn from the evidence presented and by its common sense.

■ The court is aware that other courts have invalidated zoning schemes which allowed a greater number of sites than in the case at bar, *see e.g. Alexander v. City of Minneapolis,* 698 F.2d 936, 938–39 (8th Cir. 1983) (twelve relocation sites for thirty businesses unconstitutional); *CLR Corp. v. Henline,* 702 F.2d 637, 639 (6th Cir.1983)(ordinance impermissibly restricted First Amendment expression, as "the impact of the ... ordinance is to permit two to four restricted uses in a half-mile strip of the city"); *Young v. City of Simi Valley,* 977 F.Supp. 1017, 1022 (C.D.Cal.1997)(three to four sites insufficient), and that the Ninth Circuit concluded in one case that the "small handful" of sites within three areas of the city amounted to a "glaring" constitutional infringement. *Walnut Properties,* 861 F.2d at 1109. However, the demand for adult entertainment businesses as well as for adult business locations in a community of Taft's small size and population cannot be presumed comparable to that of the larger cities at issue in *Walnut Properties* (Whittier), *Alexander* (Minneapolis), *Henline* (Wyoming, MI) and *Young v. City of Simi Valley* (Simi Valley). Even before enactment of the current and former adult use zoning ordinances, Taft's population of only six thousand had never supported a video- or bookstore devoted mostly to adult entertainment. Indeed, the limited evidence indicates that no prospective proprietor other than Diamond had ever even applied for a permit to open an adult entertainment business in Taft. *Cf. 3570 East Foothill Blvd., Inc. v. City of Pasadena,* 980 F.Supp. 329, 342 (C.D.Cal.1997) ("The City's community need for adult businesses, thus, appears to be small, considering that Plaintiff is the only person or corporation to have applied to open an adult business in over ten years."). Given the limited demand both for adult businesses and adult business locations, the court is satisfied based on all the evidence presented, that the allocation of three alternative sites in the present case does not impermissibly restrict alternative avenues of communication.

### III. Conditional Use Permit

■ Finally, the court rejects Diamond's contention, based on *Young v. City of Simi Valley,* that the CUP requirement renders all of the proposed sites unavailable because it imposes a burden on adult entertainment businesses over and above the already restrictive requirements of the ordinance. As a general matter, adult businesses may be subjected to properly circumscribed licensing or permit requirements as part of a city's effort to regulate the secondary effects of such businesses. *See Kev, Inc. v. Kitsap County,* 793 F.2d 1053, 1059–60 (9th Cir. 1986); *Genusa v. Peoria,* 619 F.2d 1203, 1212–13, 1217 (7th Cir.1980) (upholding permit requirement against adult bookstores but invalidating portions because of excessive substantive discretion conferred on city officials). Although as an added encumbrance to adult business operation the permit process is constitutionally suspect, the mere requirement that adult businesses submit to

the process is not unconstitutional per se. *See American] Mini Theatres,* 427 U.S. at 62, 96 S.Ct. 2440 ("The mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances."). Insofar as the overwhelming hardship to which Diamond refers presumes the denial of a CUP in his case, the court declines to speculate on the Taft City Council's likely resolution of any future permit application.

The holding in *Young v. City of Simi Valley* that the paucity of available sites combined with the CUP provision in that case invalidated Simi Valley's zoning ordinance, is not controlling here. In that case, the city ordinance allowed any sensitive use—such as a church or school—to disqualify from the CUP process an otherwise conforming adult business merely by applying for a zoning clearance within a distance prohibitively close to the prospective adult use. *Young,* 977 F.Supp. at 1020. The district court concluded that the Simi Valley ordinance prescribed "a system of de facto veto power on the part of churches, schools, etc. over protected first amendment activity," and thus served to deprive adult businesses of the few sites available:

> [A] system whereby third parties can effectively nullify the few areas set aside as 'reasonable alternative avenues,' at least where there is such a paucity of alternative sites as exists in the instant case, makes it unreasonably difficult, if not impossible, for an adult usage applicant to complete the permit process, and thus is unconstitutional.

*Id.* In the instant case, no such effective "veto" power on the part of third parties exists. The rationale employed in *Young v. City of Simi Valley* was, as the court's opinion makes clear, confined to the peculiar facts of that case, and is inapplicable to the circumstances of the instant case. Contrary to Diamond's suggestion, that court's holding does not stand for the proposition that, within an otherwise lawful zoning scheme, the mere requirement of obtaining a permit necessarily renders unavailable sites otherwise suitable for inclusion in the relevant market under *Topanga Press.*

■ In order to withstand scrutiny as a prior restraint, however, the particular provisions of the City's CUP requirement must adequately limit the discretion of city officials to grant or deny the permit.[15] *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Whether permit schemes demand scrutiny as prior restraints or are entitled to the more deferential "content-neutral time place and manner" review has been the subject of some confusion among the courts. The weight of authority suggests that an unconstitutional prior restraint cannot be upheld as a "content-neutral time, place and manner" regulation. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 223, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)("Because we conclude that the city's licensing scheme lacks adequate procedural safeguards, we do not reach the issue decided by the Court of Appeals whether the ordinance is properly viewed as a content-neutral time, place, and manner restriction aimed at secondary effects arising out of the sexually oriented businesses."); *Lakewood v. Plain Dealer Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)(engaging in prior restraint analysis to sustain facial challenge to newspaper-dispenser licensing scheme); *11126 Baltimore Blvd., Inc. v. Prince George's County, Md.,* 58 F.3d 988, 995 (4th Cir.1995)(*FW/PBS* "made clear that otherwise valid content-neutral time, place, and manner restrictions that require governmental permission prior to engaging in pro-

---

**15.** Although Diamond has never applied for a CUP for a site which complied with the ordinance's locational restrictions, he nevertheless has standing to facially challenge the CUP requirement because he alleges that permit approval is subject to the "unbridled discretion" of city officials. *See Baby Tam & Co., Inc. v. City of Las Vegas,* 154 F.3d 1097, 1100 (9th Cir.1998). The Supreme Court has "long held that when a li-

censing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).

tected speech must be analyzed as prior restraints and are unconstitutional if they do not limit the discretion of the decision-maker and provide for ... procedural safeguards."), *cert. denied, Prince George's County, Md. v. 11126 Baltimore Blvd., Inc.,* 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 492 (1995); *Graff v. City of Chicago,* 9 F.3d 1309, 1335 (7th Cir.1993)(concurring opinion)(explaining that *FW/PBS* and *Lakewood* mandate prior restraint analysis rather than application of "time, place and manner" test where licensing scheme fails to provide adequate procedural or substantive guarantees), *cert. denied,* 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 464 (1994); *TJ's South, Inc. v. Town of Lowell,* 895 F.Supp. 1124, 1134 (N.D.Ind. 1995)("once deemed an unconstitutional prior restraint, a permit scheme is simply unconstitutional, and no strong showing under time, place, and manner doctrine can change that."). An ordinance that grants "unbridled discretion" to the government decision-maker in granting or denying permission to engage in First Amendment activity "implicitly vests that government official with the power to regulate speech on the basis of its content and/or the viewpoint of the speaker." *Dease v. City of Anaheim,* 826 F.Supp. 336, 343 (C.D.Cal.1993); *Nakatomi Investments, Inc. v. City of Schenectady,* 949 F.Supp. 988, 1002 (N.D.N.Y.1997). It is thus inherently inconsistent with a valid time, place, and manner regulation. *Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

█ By conditioning the exercise of an act of protected speech upon the prior approval of a government body, the Taft CUP requirement acts as a prior restraint on First Amendment freedom. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Baby Tam & Co., Inc. v. City of Las Vegas,* 154 F.3d 1097, 1100 (9th Cir.1998). Although not unconstitutional per se, "any system of prior restraint ... [bears] a heavy presumption against its constitutional validity." *FW/PBS,* 493 U.S. at 225, 110 S.Ct. 596.

The validity of a licensing scheme is determined by the criteria set forth to guide the licensing authority; those employing "narrow, objective, and definite standards" are constitutional; *Shuttlesworth,* 394 U.S. at 150–151, 89 S.Ct. 935; *Santa Fe Springs Realty Corp. v. City of Westminster,* 906 F.Supp. 1341, 1364 (C.D.Cal.1995)(applying *Shuttlesworth* in adult business context); those which "condition the free exercise of First Amendment rights on the 'unbridled discretion' of government officials," on the other hand, inherently pose risks of illegitimate censorship and are not. *Gaudiya Vaishnava Soc'y v. City and County of San Francisco,* 952 F.2d 1059, 1065 (9th Cir. 1990), *cert. denied,* 504 U.S. 914, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992); *see FW/PBS,* 493 U.S. at 225–26, 110 S.Ct. 596. The reasoning behind this distinction is that "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Southeastern Promotions,* 420 U.S. at 553, 95 S.Ct. 1239.

"[T]he limits the city claims are implicit in its law [must] be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood,* 486 U.S. at 770, 108 S.Ct. 2138. Because the parties have offered no judicial or administrative construction of the CUP provision nor any evidence of well-established practice in applying it, the court turns to the text of the Taft Municipal Code to determine whether Taft city officials are properly limited in their discretion to grant or deny CUPs.

Adult entertainment businesses in Taft are required to obtain a CUP approved by the City Council upon the recommendation of the Planning Commission. Taft, CA, Code § 6–31–3. The only standards guiding the permit inquiry are set forth in section 6–26–3 of the Planning and Zoning Code (Title VI) which provides that conditional uses "may be permitted in zones from which they are prohibited by [ ] Title [VI] where such uses are found to be essential or desirable to the public convenience or welfare and are in harmony with the elements and objectives of the General Plan."[16] Taft, CA, Code § 6–26–3(A).

16. As a preliminary matter, it is unclear whether this standard even applies to adult entertainment

Courts have deemed ordinances containing similar language too broad to meaningfully limit the discretion of city officials.

In *Shuttlesworth,* a licensing ordinance that allowed an official to deny a permit if its issuance would threaten "the public welfare, peace, safety, health, decency, good order, morals, or convenience" of the community was held to vest "virtually unbridled and absolute power" in the licensing authority. *Shuttlesworth,* 394 U.S. at 149–50, 89 S.Ct. 935. Similarly, in *Staub v. City of Baxley,* 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958), the Supreme Court considered an ordinance authorizing the mayor and the city council to refuse to grant a permit to solicit members for a union if they did not approve of its "effects upon the general welfare of citizens." The Court invalidated the law, finding the stated criteria "without semblance of definitive standards or other controlling guides governing the action of the Mayor and Council in granting or withholding a permit." *Staub v. City of Baxley,* 355 U.S. at 322, 78 S.Ct. 277. Likewise, in *3570 East Foothill Blvd., Inc. v. City of Pasadena,* 912 F.Supp. 1268 (C.D.Cal.1996) [hereinafter "*3570 East Foothill II* "], the court severed a conditional use permit provision in an adult business zoning ordinance which allowed the denial of the permit if the proposed use would be "detrimental to the public health, safety, or welfare of persons residing or working adjacent to the neighborhood of such use." The district court concluded that the provision vested city officials with "unbridled discretion to grant [or deny] permits" and thus ran the risk that the licensor would

"censor speech for impermissibly content-based covert motivations and then later rationalize the decision with seemingly permissible content-neutral reasons." *3570 East Foothill II,* 912 F.Supp. at 1275. Other lower courts are in accord. *See e.g. Dease v. City of Anaheim,* 826 F.Supp. at 344 ("peace, health, safety, and general welfare" of the area); *TJ's South,* 895 F.Supp. at 1130 ("necessary for the public convenience at that location;" designed for protection of "public health, safety, and welfare;" must not cause potential for "injury to the value" of neighborhood property); *Mga Susu, Inc. v. County of Benton,* 853 F.Supp. 1147, 1150 (D.Minn.1994)(ordinance required consideration of "the effect of the proposed use on the health, safety, morals and general welfare of residents"); *see also Genusa v. City of Peoria,* 619 F.2d at 1217 (striking portion of CUP ordinance requiring denial of permit if applicant is "person who is not of good moral character and reputation in the community"); *Bukaka, Inc. v. County of Benton,* 852 F.Supp. 807, 813 (D.Minn.1993)(permit scheme constitutionally suspect where other decision factors were to be considered in light of "health, safety, morals and general welfare").

The court discerns no distinction of substance between the licensing schemes struck down in these cases and the one at issue here. Even assuming the applicability of section 6–26–3(A)'s standard to adult uses, see supra note 16, it fails to limit the substantive discretion of city officials in any meaningful way. The provision's mandate that uses may be granted permits only where

businesses. The language of the provision suggests that its standard covers only proposed uses in "zones from which they are prohibited." Taft, CA, Code § 6–26–3(A). Under Taft's zoning scheme, adult uses must both conform to the locational restrictions of the scheme and obtain a CUP. *See* Taft, CA, Code § 6–31–3. In effect then, CUP consideration is unwarranted until a prospective adult businesses has proposed a location which is within in a permissible zone (C–1, C–2, M–1 or M–2) and which maintains the required buffer zones from sensitive uses. Any prospective adult business applying for a CUP would therefore necessarily not be prohibited from the zone in which it sought to locate and thus would not be subject to the standard of section 6–26–3(A). Because no other provision of the Taft Municipal Code (including Chapter

31, dealing with adult entertainment businesses) mentions the standard to be applied specifically to adult business CUP applications, the determination of adult use CUP eligibility would be rendered wholly lacking in decision-making criteria. As the Seventh Circuit has noted, the Supreme Court has "unfailingly condemned" regulations which grant government officials "standardless carte blanche" to permit or prohibit expression. *Graff,* 9 F.3d at 1329 (citing *Shuttlesworth,* supra; *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); and *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)). The Ninth Circuit has also made clear that permit schemes which contain no explicit grounds for granting or denying permits are unconstitutional prior restraints. *Gaudiya Vaishnava Soc'y,* 952 F.2d at 1065–66.

deemed "essential or desirable to the public convenience or welfare" clearly vests the Taft City Council with unfettered discretion and raises "the spectre of selective enforcement on the basis of the content of speech." *Gaudiya Vaishnava Soc'y*, 952 F.2d at 1066 (quoting *N.A.A.C.P., Western Region v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984)). Indeed, this amorphous standard could scarcely be more susceptible of surreptitious abuse. *Cf. TJ's South*, 895 F.Supp. at 1130 ("Surely, few uses of property are truly necessary to maintaining public convenience. This would seem particularly true for entertainment."). By employing such indefinite and subjective criteria, the CUP provision effectively grants the Taft City Council a license to impose an outright ban on protected speech which it deems morally unsuitable. It further presents one of the primary dangers against which the Supreme Court's prior restraint doctrine is intended to guard; that is, the difficulty of "effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the censor's action." *Lakewood*, 486 U.S. at 759, 108 S.Ct. 2138. Because the City's CUP scheme fails to provide even the semblance of "narrow, objective, and definite standards to guide the licensing authority," it is facially invalid as an unconstitutional prior restraint.[17] *Shuttlesworth*, 394 U.S. at 151, 89 S.Ct. 935.

■ The court is thus left with the question of whether the permit requirement invalidates the entire adult business regulation scheme or may be severed from Chapter 31 of the Taft Municipal Code. Given the policy in favor of upholding legislative enactments to the extent they are constitutionally sound and the court's determination that the adult business zoning scheme can survive the absence of the permit provision, the court concludes that severance is the appropriate measure.

"[A] court should refrain from invalidating more of the statute than is neces-

sary.... '[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid.' " *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984)(plurality opinion)(quoting *El Paso & Northeastern R. Co. v. Gutierrez*, 215 U.S. 87, 96, 30 S.Ct. 21, 54 L.Ed. 106 (1909)). The standard for determining severability is "well established:" "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as law." *Alaska Airlines v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987). The Ninth Circuit has explained that this standard consists of two inquiries; first, "whether the Act which remains after the unconstitutional provisions are excised is 'fully operative;' " and second, whether the legislative body would have enacted the constitutional provisions of the statute "independently of the unconstitutional provisions." *Board of Natural Resources of State of Wash. v. Brown*, 992 F.2d 937, 948 (9th Cir. 1993).

Chapter 31 of the Taft Municipal Code, regulating adult entertainment businesses, is fully operative without the permit provision of section 6–31–3. The permit requirement is a separate and distinct precondition to the operation of an adult business in Taft, imposed in addition to the locational restrictions of the rest of the adult use zoning scheme. As reasoned by the *3570 East Foothill Blvd. II* court in severing Pasadena's similar CUP ordinance from its adult business regulation: "[w]ithout the unconstitutional permitting ordinances, [Taft] still retains a working zoning scheme, albeit without pre-use screening authority." *3570 East Foothill II*, 912 F.Supp. at 1282. Nothing in Chapter 31 indicates that the process of conditional use review, as presently constituted, was regarded as a cru-

---

**17.** Because the scheme is constitutionally infirm due to the substantive discretion it confers on city officials, and because Diamond has not challenged the procedural aspects of the CUP process, the court does not address the adequacy of its procedural safeguards. *See FW/PBS*, 493 U.S.

at 228, 110 S.Ct. 596 (prior restraints must provide certain procedural guarantees); *Dease*, 826 F.Supp. at 343 (determination of adequacy of procedural safeguards unnecessary where licensing scheme grants excessive substantive discretion to government officials).

cial mechanism for the enforcement of the zoning scheme's other restrictions. Although it is clear that permit approval is contingent upon the satisfaction of all locational conditions in Chapter 31 of the Planning and Zoning Code, neither section 6–31–3 nor section 6–26–3 requires the Planning Commission or City Council to consider this criterion in granting or denying a CUP. The omission is all the more conspicuous in light of section 6–26–3(A)'s explicit requirement that city officials consider whether the proposed use is "in harmony with the elements and objectives of the General Plan." Taft, CA, Code § 6–26–3(A). The permit provision's " 'elimination in no way alters the substantive reach of the statute and leaves completely unchanged its basic operation,' " thus making it "functionally independent" from the remainder of the ordinance. See Brown, 992 F.2d at 948 (quoting United States v. Jackson, 390 U.S. 570, 586, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)).

It seems equally clear that the Taft City Council would have enacted the constitutional provisions of Chapter 31 independently of the unconstitutional provisions. The stated purpose of the adult business zoning scheme—to reduce the urban blight and downgrading of adjacent neighborhoods created by the concentration of adult uses—would still be furthered by the locational restrictions remaining in force. Chapter 31's reversionary clause further supports severance. That clause provides that in the event that any provision of the chapter is held unconstitutional, Ordinances 524 and 593 "shall remain in full force and effect." Taft, CA, Code § 6–31–9. Although the court has not been provided with the text of these ordinances, it is clear from the parties' stipulated facts that Ordinance 524 was the former incarnation of the present adult businesses zoning ordinance and contained similar, albeit somewhat less restrictive, locational constraints. Ordinance 524 limited adult businesses to the same zones as the present Chapter 31—(C1), (C2), (M1) and (M2)—and prohibited their location within 1000 feet of residential property, any other adult entertainment business, any public or duly licensed private school or college, or within 500 feet of any park or public playground, public library, church or

other religious facility. See Pretrial Order, 2:4–19.

In the court's opinion, the City Council's intent in adopting the reversionary clause was not to invite, upon a finding of infirmity as to the distinct CUP provision, the wholesale sup .ession of its zoning system, but rather to ensure the preservation of a zoning framework that would pass constitutional muster as well serve the Council's primary objectives in regulating adult businesses. The remainder of Chapter 31 fulfills both these goals.

The City's adult business zoning scheme is fully operative without the CUP provision and likely would have been enacted by the Taft City Council even without the permit requirement. Accordingly, the court heeds the Supreme Court's admonition to "refrain from invalidating more of the statute than is necessary" and declines to strike down the entire adult business zoning scheme. Alaska Airlines, 480 U.S. at 684, 107 S.Ct. 1476; see also Genusa, 619 F.2d at 1212–13, 1217(upholding permit requirement against adult bookstores as general matter but invalidating portions because of excessive substantive discretion); 3570 East Foothill Blvd. II, 912 F.Supp. 1268 at 1280–82 (severing unconstitutional CUP provision from adult business zoning scheme). As a violation of First Amendment rights, the CUP provision constitutes an irreparable injury for which there is no adequate legal remedy. Topanga Press, Inc. v. City of Los Angeles, 989 F.2d at 1528. The City's enforcement of the CUP provision against adult entertainment businesses must therefore be enjoined.

## CONCLUSION

Because the City's adult use zoning ordinance is a content-neutral time, place and manner restriction designed to further a substantial government interest and allows adult entertainment businesses reasonable alternative avenues of communication in Taft, it does not violate the First Amendment. Accordingly, Diamond's request for damages and injunctive relief against the zoning and locational restrictions of the ordinance is denied.

The ordinance's CUP provision, however, vests Taft city officials with excessive substantive discretion and must thus be invalidated as an unconstitutional prior restraint. Because the provision operates independently from the rest of Taft's adult business zoning plan, it may be severed from Chapter 31 of the Taft Municipal Code, leaving all other Chapter 31 regulations pertaining to adult uses in effect.

## ORDER

For the reasons stated in the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED that:

1. Diamond's application for a permanent injunction against enforcement of Title VI, Chapter 31 of the Taft Municipal Code is DENIED, except in the following respect;

2. The City of Taft is PERMANENTLY ENJOINED from enforcing the conditional use permit requirement of Title VI, Chapter 31, section 6–31–3 of the Taft Municipal Code unless and until the provisions of section 6–26–3(A), as applied to adult entertainment businesses under Title VI, Chapter 31, section 6–31–3, are modified to conform to constitutional standards in a manner consistent with the foregoing Findings of Fact and Conclusions of Law;

3. Judgment is GRANTED in favor of the City of Taft on Diamond's cause of action for damages; and

4. Judgment shall be entered accordingly.